**UNITED STATES of America, Plaintiff,**

v.

**UNIFIED SCHOOL DISTRICT NO. 500, KANSAS CITY (WYANDOTTE COUNTY), KANSAS, et al., Defendants.**

**Civil Action No. KC–3738–EEO.**

United States District Court,
D. Kansas.

Aug. 6, 1997.

Memorandum Supplementing
Decision Aug. 14, 1997

Pauline A. Miller, Civil Rights Div., Educational Opportunities Litigation Section, U.S. Dept. of Justice, Washington, DC, for Plaintiff.

Deryl W. Wynn, McAnany, Van Cleave & Phillips, Kansas City, KS, for Defendants.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, District Judge.

This matter is before the court on the motion of defendants Unified School District No. 500, Kansas City, Wyandotte County, Kansas ("the District"), Members of the Board of Education for the District, and the Superintendent Of Schools for the District for declaration of unitary status and order of dismissal (Doc. # 389). Both the defendants and the government have filed briefs in support of defendants' motion. The court held a hearing on defendants' motion on August 6, 1997. After reviewing the parties' briefs and evidentiary materials, the annual reports submitted by the defendants, and the testi-

mony at the hearing, the court is prepared to rule. This memorandum and order is simply a summary of the court's findings and conclusions. A more detailed memorandum and order setting forth the court's factual findings and reasoning in ruling on defendants' motion will be issued in the near future.

█ School districts that once operated a racially dual system are "charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green v. County School Bd. of New Kent County, Virginia*, 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). The District must establish that every aspect of its school system is unitary including student attendance patterns, faculty, staff, transportation, extracurricular activities, and facilities. *See Freeman v. Pitts*, 503 U.S. 467, 486, 112 S.Ct. 1430, 1443, 118 L.Ed.2d 108 (1992); *Green*, 391 U.S. at 435, 88 S.Ct. at 1692–93.

█ The United States Supreme Court has set forth several factors which must be evaluated by a district court before a school system can be declared unitary and judicial supervision can be withdrawn. These factors include (1) whether the District has fully and satisfactorily complied with the court's decrees for a reasonable period of time, (2) whether the vestiges of past discrimination have been eliminated to the extent practicable, and (3) whether the District has demonstrated a good faith commitment to the whole of the court's decrees and to those provisions of the law and the Constitution that were the predicate for judicial intervention. See *Missouri v. Jenkins*, 515 U.S. 70, 87–89, 115 S.Ct. 2038, 2049, 132 L.Ed.2d 63 (1995); *Freeman*, 503 U.S. at 491–92, 498, 112 S.Ct. at 1445–46, 1449; *Board of Educ. v. Dowell*, 498 U.S. 237, 248–50, 111 S.Ct. 630, 637–38, 112 L.Ed.2d 715 (1991).

## I. Student Assignments.

█ Student racial balance has increased in four of the five schools that we previously held were unconstitutionally segregated, *i.e.*, Sumner High School, Banneker Elementary School, Douglass Elementary School, and Grant Elementary School. The fifth school, Northeast Junior High School, has been closed. In addition, the District has achieved excellent results in achieving racial balance at the other schools that were not specifically found to be unconstitutionally segregated in our 1977 or 1981 desegregation orders. The District's efforts at these other schools is commendable and a strong indication of the District's commitment to the Fourteenth Amendment of the United States Constitution.

## II. Faculty And Staff Assignments.

We emphasized in our original desegregation orders that the District had a continuing duty to achieve faculty racial balance and to eliminate the racial identifiability of student populations at schools by reference to the predominant race of their respective faculties. Faculty racial balance has increased significantly at schools throughout the District. In particular, the racial balance of faculty at schools with black student populations greater than 75%, which was a problem area in 1977, has improved substantially.

## III. Transportation, Extracurricular Activities, & Facilities.

The court has analyzed each of these aspects of the school system and finds that all vestiges of segregation in these areas have been removed to the extent practicable.

## IV. Desegregation Exit Plan.

The Department of Justice and District officials jointly developed the Desegregation Exit Plan. Notably, the Exit Plan goes beyond the scope of our remedial orders in this case and actually addresses the entire school system. The Exit Plan is based in part on the premise that educational opportunities can be improved by and through schools that are racially balanced. The Board of Education also has adopted a resolution which reflects the District's commitment to both quality education and the principle of racial equality.

## V. Conclusion.

After careful consideration, we find that the District has fully and satisfactorily complied with the court's decrees for a reasonable period of time, the vestiges of past

discrimination have been eliminated to the extent practicable, and the District has demonstrated a good faith commitment to desegregation and the Fourteenth Amendment of the United States Constitution. The District therefore has attained unitary status.

IT IS THEREFORE ORDERED that defendants' motion for declaration of unitary status and order of dismissal (Doc. # 389) is granted.

IT IS FURTHER ORDERED that all injunctions in this case are dissolved.

## SUPPLEMENTAL MEMORANDUM AND ORDER

On August 6, 1997, the court issued an order granting the motion of defendants Unified School District No. 500, Kansas City, Wyandotte County, Kansas ("the District"), Members of the Board of Education for the District, and the Superintendent Of Schools for the District for declaration of unitary status and order of dismissal (Doc. # 389). This memorandum will supplement and provide the underlying factual findings that formed the bases for the conclusions expressed in the court's August 6, 1997 order.

### Background

On May 18, 1973, the United States filed a complaint alleging that the District deliberately created and maintained teaching faculties and administrative staffs which were segregated based on race in violation of Titles IV and VII of the Civil Rights Act of 1964 and the Fourteenth Amendment to the United States Constitution. Before trial, the United States filed a supplemental complaint alleging that the District had contributed to student racial isolation in a number of ways. Throughout these proceedings, the District vigorously contested the government's allegations.

After a twenty-six day trial to the court, we issued our original desegregation order on February 14, 1977 ("1977 Order"). In that order, we held that the Kansas City, Kansas Public Schools were being administered in violation of the Fourteenth Amendment to the United States Constitution and the holding of *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). The court held specifically that the

District had failed to achieve a unitary, integrated school system with respect to five of the District's fifty-five schools. The court directed the District to formulate a plan to alleviate the unconstitutional de jure segregation at Sumner High School, Northeast Junior High School, Banneker Elementary School, Douglass Elementary School, and Grant Elementary School. The court also held that remnants of segregation remained in the area of faculty and staff assignments. Shortly thereafter, the court approved a desegregation plan developed by the District. The plan was fully implemented in 1978.

The government appealed this court's decision to the Tenth Circuit Court of Appeals in late 1977. On November 19, 1979, the Tenth Circuit vacated the judgment and remanded the case to be reconsidered in light of the Supreme Court's decisions in *Columbus Bd. of Educ. v. Penick,* 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979), and *Dayton Bd. of Educ. v. Brinkman,* 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979). *See United States v. Unified School Dist. No. 500, Kansas City, Kansas,* 610 F.2d 688, 693 (10th Cir.1979). Defendants continued to follow the remedial plan previously approved by this court even after the Tenth Circuit's decision.

Before this court had issued its ruling on reconsideration of the 1977 Order, the government requested that Banneker, Douglass, and Grant Elementary Schools be integrated immediately. On March 18, 1980, the court partially sustained the government's motion and ordered immediate integration of grades three through six of these segregated elementary schools. Shortly thereafter, the court adopted a plan involving two pairs and one cluster of three schools to accomplish the desegregation of Banneker, Douglass, and Grant schools.

On March 18, 1981, after reconsideration of our 1977 Order, we issued a memorandum and order which readopted in large part the previous liability and remedy orders ("1981 Order"). The court entered judgment on May 20, 1981, and the government again appealed the court's desegregation order. The parties subsequently reached a settle-

ment and the Tenth Circuit dismissed the appeal on July 21, 1982.

The court has since issued various orders modifying the 1981 desegregation order. In sum, the court has imposed several remedies, including the pairing of six elementary schools, the closing of Northeast Middle School, the development of feeder patterns to ensure that students would move into integrated schools, the introduction of a magnet program at Sumner High School which created an academy of arts and science emphasizing preparation for post-secondary education, the introduction of racial balance transfers, the later development of a district-wide high school magnet program, and the establishment of a racially balanced faculty. Given the complexity of implementing a desegregation plan, the District has sought and the court has approved various modifications to the original desegregation plan. A summary of these modifications is set forth in section I below.

Since 1978, the District has filed with the court detailed annual reports discussing the effectiveness of the remedies implemented and the District's compliance with the court's orders. We note that the District's annual reports for the most part have been unchallenged by the government and approved by the court. We consistently have noted that the defendants have made progress toward eliminating the remnants of past discrimination and that the defendants have steadfastly continued their efforts to comply with the desegregation plan approved by the court. *See, e.g.,* Jan. 19, 1988 Mem. & Order.

Since 1994, the Department of Justice and the District have jointly worked to end judicial supervision of this case. The parties have developed a Desegregation Exit Plan which is designed to further the educational and desegregation goals originally enunciated by the court. The Desegregation Exit Plan is explained in Section VI below.

The District now seeks a declaration that its school system is unitary and an order dismissing this case. The government also requests that the court grant plaintiff's motion. The District provided notice to the local community of its motion and the opportunity to file written comments with the court. Other than the briefs filed by the

defendants and the government, no comments have been filed with the court.

The court held a hearing on defendants' motion on August 6, 1997. Eight witnesses including past and present District administrators testified on behalf of the defendants. In addition, the government presented two expert witnesses in support of defendants' motion.

### Analysis

■ The District bears the burden of establishing that its school system is now unitary and that any current racial imbalance is not the product of or related to its prior segregative practices. *See Freeman v. Pitts,* 503 U.S. 467, 494, 112 S.Ct. 1430, 1447–48, 118 L.Ed.2d 108 (1992); *Brown v. Board of Educ.,* 978 F.2d 585, 588 (10th Cir.1992), *cert. denied,* 509 U.S. 903, 113 S.Ct. 2994, 125 L.Ed.2d 688 (1993). School districts that once operated a racially dual system are "charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green v. County School Bd. of New Kent County, Va.,* 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1693–94, 20 L.Ed.2d 716 (1968). The District must establish that every aspect of its school system is unitary, including student attendance patterns, faculty, staff, transportation, extracurricular activities, and facilities. *See Freeman,* 503 U.S. at 486, 112 S.Ct. at 1443; *Green,* 391 U.S. at 435, 88 S.Ct. at 1692–93.

Some courts also have evaluated the quality of education provided by the school district where the quality of education had been impacted by segregation. *See, e.g., Freeman,* 503 U.S. at 492–93, 112 S.Ct. at 1446–47 (discussing district court's analysis of quality of education with respect to allocation of resources). In this case, the United States did not allege and we did not find any violation in the area of quality of education. Indeed, we noted in 1977 and again in 1981 that we were "greatly impressed by the apparent high quality of the educational programs which the defendants—under the experienced and accomplished leadership of superintendent O.L. Plucker—have forged

from quite limited financial resources." 1977 Order at 6; 1981 Order at 9. Similarly, in .1986, we noted that Sumner Academy received national recognition by the United States Department of Education as a school "that has been uncommonly successful in. providing high quality education to its students." Feb. 18, 1986 Mem. & Order at 1–2. Therefore, we conclude that an analysis of the quality of education provided by the District is unnecessary for purposes of deciding the District's motion for dismissal. *See Missouri v. Jenkins,* 515 U.S. 70, 102–04, 115 S.Ct. 2038, 2056, 132 L.Ed.2d 63 (1995) ("insistence upon academic goals unrelated to the effects of legal segregation unwarrantably postpones the day when the [school system] will be able to operate on its own").

■ Judicial supervision of local school districts is not intended to be a permanent measure. *See Jenkins,* 515 U.S. at 87–89, 115 S.Ct. at 2049; *Board of Educ. v. Dowell,* 498 U.S. 237, 247, 111 S.Ct. 630, 636–37, 112 L.Ed.2d 715 (1991). A federal court's control of the local school board should "not extend beyond the time required to remedy the effects of past intentional discrimination." *Dowell,* 498 U.S. at 248, 111 S.Ct. at 637. We are mindful of the importance of local control of public school systems and that "local autonomy of school district[s] is a vital national tradition." *Freeman,* 503 U.S. at 490, 112 S.Ct. at 1445 (quoting *Dayton Bd. of Educ. v. Brinkman,* 433 U.S. 406, 410, 97 S.Ct. 2766, 2770, 53 L.Ed.2d 851 (1977)); *see Dowell,* 498 U.S. at 248, 111 S.Ct. at 637. "Returning schools to the control of local authorities at the earliest practicable date is essential to restore their true accountability in our governmental system." *Freeman,* 503 U.S. at 490, 112 S.Ct. at 1445. If a school system complies with the court's decrees, eliminates the effects of past discrimination, and shows its commitment to maintain a unitary system, judicial intervention should cease. *See id.* at 491, 112 S.Ct. at 1445–46.

The Supreme Court has noted that the term "unitary," which is not found in the Constitution, is difficult to define precisely. *See Freeman,* 503 U.S. at 487, 112 S.Ct. at 1443–44; *Dowell,* 498 U.S. at 245–46, 111 S.Ct. at 635–36. Most courts use the term "unitary" to describe "a school system which has been brought into compliance with the command of the Constitution." *Dowell,* 498 U.S. at 246, 111 S.Ct. at 636. The requirement of a "unitary" school system, however, "does not confine the discretion and authority of the District Court in a way that departs from traditional equitable principles." *Freeman,* 503 U.S. at 487, 112 S.Ct. at 1443–44. Therefore, a court should exercise its equitable power in a school desegregation case "to adjust remedies in a feasible and practical way to eliminate the conditions or redress the injuries caused by unlawful action." *Id.*

The determination of whether a school district is unitary is highly fact specific. The United States Supreme Court has set forth several factors which must be evaluated by a district court before a school system can be declared unitary and judicial supervision can be withdrawn. These factors include (1) whether the District has fully and satisfactorily complied with the court's decrees for a reasonable period of time, (2) whether the vestiges of past discrimination have been eliminated to the extent practicable, and (3) whether the District has demonstrated a good faith commitment to the whole of the court's decrees and to those provisions of the law and the Constitution that were the predicate for judicial, intervention. *See Jenkins,* 515 U.S. at 89, 115 S.Ct. at 2049; *Freeman,* 503 U.S. at 491–92, 498, 112 S.Ct. at 1445–46, 1449; *Dowell,* 498 U.S. at 248–50, 111 S.Ct. at 637–38.[1]

■ Absent from these standards articulated by the Supreme Court is any requirement that a school system must be integrated within a certain statistical standard before a court can declare a school system unitary.

---

1. All three factors are interrelated and the same evidence often is used for determining a school district's compliance under each factor. Some courts analyze the first and third factors as one, *i.e.,* whether the school district has complied in good faith with the court's desegregation decrees. We have separated the good faith inquiry

for purposes of deciding the District's motion in this case. Under the first factor, the District must establish its past compliance with the court's decrees. Under the third factor, the District must show its past and future commitment to desegregation and the Fourteenth Amendment to the United States Constitution.

See *Keyes v. Congress of Hispanic Educators,* 902 F.Supp. 1274, 1283 (D.Colo.1995), *appeal dismissed,* 119 F.3d 1437 (10th Cir. 1997). We recognize that there is a difference between "desegregation" and "integration." *Brown v. Board of Education* and the Fourteenth Amendment prohibit "segregation of races in public schools with a purpose to impose disadvantages because of race. . . . [D]e jure racial segregation is prohibited but racial integration is not required." *Keyes,* 902 F.Supp. at 1283.

First, we will analyze the factors for determining unitary status with respect to student assignments, faculty, staff, transportation, extracurricular activities, and facilities. Then, we will analyze the District's good faith commitment to desegregation and the Constitution, including the District's proposed Desegregation Exit Plan.

## I. Student Assignments.

Prior to 1954, the District operated a dual system which was authorized though not required by state statute. The District adhered to a neighborhood school policy, but achieved complete student racial segregation by creating two sets of elementary school attendance area boundaries. There was one set of boundaries for white students and another for black students which were superimposed upon the same geographical area. From 1954 to 1977, the District was able to achieve racial balance' in a number of schools. Twelve schools, however, remained segregated as of 1977. These schools included Grant, Douglass, Banneker, Bryant, Chelsea, Fairfax, Hawthorne, Parker, Quindaro, Northeast, Northwest, and Sumner. In our 1977 Order, we held that the District was not legally responsible for creating or contributing to the racial imbalance in Bryant, Chelsea,. Fairfax, Parker, Quindaro, or Northwest schools. Rather, we found that residential racial transition in the geographical areas of those schools primarily was responsible for the segregated student populations. With respect to Hawthorne, the court concluded that the school would have exhibited no lesser degree of student racial imbalance even if the defendants had not acted in a discriminatory manner.

As noted above, the court held in its 1977 Order that the defendants had purposefully created and maintained segregated school facilities at Sumner, Northeast, Banneker, Douglass, and Grant. The court directed the District to formulate a plan to alleviate the unconstitutional de jure segregation at these schools. In response, the defendants proposed a remedy consisting of three phases. The first phase retained Banneker, Douglass, and Grant as neighborhood elementary schools, but allowed black students residing in those attendance areas the option of attending one of six nearby majority-white elementary schools. At the same time, white students at these same six majority-white schools could opt to attend Banneker, Douglass, or Grant. All students who lived more than one-half mile from the school to which they transferred under this plan were provided free transportation by the District.

The District closed Northeast Junior High School beginning with the 1977–78 school year under the second phase of the remedy plan. The Northeast attendance area was subdivided into four separate attendance areas. Students in the former Northeast attendance zone were assigned to one of four predominately white schools—Arrowhead, Central, Eisenhower, and Rosedale Junior High Schools. This rezoning was effective for the seventh and eighth grade students for the 1977–78 school year and included ninth grade students in 1978–79. During the 1977–78 school year, all ninth grade students in the former Northeast attendance area attended Sumner High School.

Under phase three of the remedy plan, Sumner High School became a magnet school serving the academically talented, highly motivated, and gifted students in grades nine through twelve. The converted facility was renamed the Sumner Academy of Arts and Science. and opened in the fall of 1978. Academically eligible students from throughout the entire district attended Sumner on a voluntary basis. The geographical area previously served by Sumner High School was subdivided into three separate high school attendance areas. Tenth-, eleventh-, and twelfth-grade students who resided in the former Sumner attendance zone were reassigned to either Schlagle, Washington, or Harmon High Schools. Free transportation

was provided for Sumner students reassigned to other high schools and for magnet students who resided more than 1.5 miles from Sumner Academy. The District also implemented a majority-to-minority transfer policy.

On March 6, 1978, we approved the District's proposed plans and the curriculum guide for the Sumner Academy of Arts and Science. On January 24, 1979, pursuant to a Consent Decree, the court approved the Sumner Academy admissions criteria.

On March 18, 1980, the court partially granted the government's motion for immediate desegregation of Banneker, Douglass, and Grant Elementary Schools. We noted in that order that the. desegregation plan should "attempt to bring the racial composition of grades 3 through 6 [of the affected schools] within the goal of no greater than a 15% variance from the district-wide student racial composition average." On June 2, 1980, we modified the goal to a 10% variance. On July 3, 1980, the court adopted the following remedy to desegregate Banneker, Douglass, and Grant Elementary Schools:

(1) Create one cluster of three schools and two pairs of schools for enrollment of pupils in grades three through six with the following grade assignments.

| Grade | Group I | Group II | Group III |
|---|---|---|---|
| 3 | F. Willard | M.E. Pearson | Grant |
| 4 | Central | Banneker | Grant |
| 5 | Douglass | Banneker | J. Fiske |
| 6 | Douglass | Banneker | (Middle School) |

(2) Continue all voluntary majority-to-minority transfers from Banneker, Douglass, and Grant Elementary Schools in 1979–80 to any school not included in the cluster and pairs stated above.

(3) All students attending one of the clustered or paired schools on a majority-to-minority transfer would be required to attend in the group of which a student's home school is a part.

(4) Additional majority-to-minority transfers from schools in the cluster and pairs would be encouraged and authorized.

(5) No majority-to-minority transfers from non-clustered or non-paired to clustered or paired schools would be authorized.

(6) The standard district transportation policy for elementary school children would continue. The standard policy provided that transportation by bus will be provided for any child whose residence exceeds nine-tenths of a mile in distance from the school to which he or she is assigned or transferred.

The overall remedial plan was modified several times by the court. The following is a brief summary of the major modifications. On February 16, 1982, the court granted the District leave to reorganize its secondary schools. Grade six throughout the District was incorporated into the middle schools as part of the reorganization. In addition, ninth grade students at Northwest Junior High School were moved to high schools so that all ninth grade students in the District attended high schools. On February 14, 1983, we allowed the District to change certain attendance zone boundary lines. On March 22, 1984, we granted defendants leave to close Bryant and Major Hudson Elementary Schools and to change certain attendance zone boundary lines to accommodate the reassignment of those students. In addition, we approved the sale of two Bryant school buildings (December 18, 1984), the Northeast Junior High School property (October 4, 1985), Major Hudson Elementary School (December 10, .1985), and the Riverview School site (July 28, 1986).

On December 24, 1987, we approved the transfer of fifth grade students from Whittier to M.E. Pearson. On August 17, 1988, we granted defendants leave to construct a new elementary school at the Whittier site, close Central and McKinley Elementary Schools, redraw attendance zones for Whittier and M.E. Pearson, and modify the desegregation plan by changing the Frances Willard–Central–Douglass cluster to a Frances Willard–Douglass pair. On February 17, 1993, we approved defendants' motion to amend the desegregation plan by establishing magnet programs within Harmon, Schlagle, Wyandotte, and Washington High Schools.

As in many desegregation cases, a statistical evaluation of the District's efforts with respect to student assignments is complicated by significant demographic changes with-

in the community. In 1977, the District's student population was 53% white and 41% black. Today, the student population is 54% black, 31% white, and 12% Hispanic. On the other hand, the adult population in the District today is approximately 65% white and 29% black. In addition, the City of Kansas City, Kansas, has not been immune from the phenomena of "white flight." Many white families apparently have moved out of the community to suburban communities. Today, many of the geographical areas in Kansas City, Kansas, are dominated by specific ethnic groups. For example, residents of the northeast area are predominately black, while residents of the western part of the city are predominately white with an increasing black population. In addition, the Armourdale and Argentine areas have a significant Hispanic presence. In light of the complicated demographics of the community, we recognize that numbers simply cannot explain fully whether a school district has a unitary system. We also note that "the law does not demand [ ] rigidity or mathematical precision" in meeting a certain statistical goal of desegregation. *Stell v. Board of Public Educ.,* 860 F.Supp. 1563, 1578 (S.D.Ga.1994); see *Mills v. Freeman,* 942 F.Supp. 1449, 1461 n. 14 (N.D.Ga.1996) ("exact mathematical quantifications are often not practical, or even instructive, in the educational field"); *Keyes,* 902 F.Supp. at 1283 ("There is no constitutional corollary requiring the mixture of races according to some formula reflecting the constituency of the community served by a single school system."). Nevertheless, statistics provide an important measure of a school system's success in converting to a unitary system. *See Freeman,* 503 U.S. at 474, 112 S.Ct. at 1437.

We address first the District's progress in achieving student racial balance at the five schools that we previously held were unconstitutionally segregated, *i.e.,* Sumner, Northeast, Banneker, Douglass, and Grant. 1981 Order at 122; 1977 Order at 106. In the four schools which are still open, the District

has made considerable progress toward achieving a racially balanced student population. A common measure used by courts to measure a school system's desegregation success is the variance (or difference) between the percentage of black students at a particular school and the district-wide percentage of black students. In this case, we have used a separate district-wide ratio for secondary and elementary schools. The following chart shows that the variance between the percentage of black students at Sumner, Banneker, Douglass, and Grant and the district-wide percentage of black students has decreased significantly since 1976.

| School | % Black 1976–77 | Variance 1976–77 | % Black 1996–97 | Variance 1996–97 |
|---|---|---|---|---|
| Sumner | 100.0 | 61.1 | 34.4 | –20.3 |
| Banneker | 99.8 | 58.8 | 64.2 | 11.0 |
| Douglass | 99.0 | 58.0 | 78.5 | 25.3 |
| Grant | 100.0 | 59.0 | 70.5 | 17.3 |

*Variance = (% black students· at school)—(district-wide % of black students at type of school, i.e., secondary or elementary). The district-wide percentage of black students in 1976–77 was 38.9% at the secondary level and 41% at the elementary level. In 1996–97, the district-wide percentage of black students was 54.7% at the secondary level and 53.2% at the elementary level.

In 1980, we specifically ordered that the District should take measures to attempt to bring the racial composition in grades 3, 4, 5, and 6 at Banneker, Douglass, and Grant Elementary Schools within a 10% variance from the district-wide student racial composition average. Grade six throughout the District was incorporated into the middle schools in 1982. For the remaining grades, 3, 4, and 5, the District achieved a considerable increase in the racial balance of the student population. The following chart shows the variance between the percentage of black and white students in grades 3, 4, and 5 at the paired elementary schools and the district-wide percentage of black and white students respectively.

*Percent Variance Of Black And White Student Populations In Grades 3. 4. And 5 From District–Wide Ratio*

| Paired Schools | 1994–95 Variance– Black Students | 1995–96 Variance– Black Students | 1996–97 Variance– Black Students | 1994–95 Variance– White Students | 1995–96 Variance– White Students | 1996–97 Variance– White Students |
|---|---|---|---|---|---|---|
| F. Willard– Dougalass | 1.0 | 10.5 | 11.6 | –3.2 | –8.3 | –8.5 |
| Pearson– Banneker | –1.5 | –4.5 | –6.8 | –15.1 | –11.7 | –11.1 |
| Grant– Fiske | –7.4 | –7.2 | –6.6 | –3.4 | 0.3 | 0.4 |

All three of the paired schools have had variances less than or near the 10% goal for the past three years. The variances above 10% at the Pearson–Banneker pair may be explained in part by a disproportionately high number of "other" minority students in these schools.[2]

The District has achieved similar success with respect to Northeast Junior High School. As noted above, the District closed Northeast and reassigned the students in the Northeast attendance area to Arrowhead, Central, Eisenhower, and Rosedale Junior High Schools. The reassigning of students, as well as other efforts by the District, has created greater racial balance in these four junior high schools while a "one-race" school, Northeast, has been closed. The following chart illustrates the District's progress.

| School | % Black 1976–77 | Variance 1976–77 | % Black 1996–97 | Variance 1996–97 |
|---|---|---|---|---|
| Northeast | 99.9 | 61.0 | closed | closed |
| Arrowhead | 7.9 | –31.0 | 54.9 | 0.2 |
| Central | 15.9 | –23.0 | 33.5 | –21.2 |
| Eisenhower | 10.3 | –28.6 | 56.3 | 1.6 |
| Rosedale | 16.2 | –22.7 | 36.5 | –18.2 |

*Variance = (%Black students at school)—(district wide % of black students at type of school, i.e., secondary or elementary). The district-wide percentage of black students at the secondary level was 38.9% in 1976–77 and 54.7% in 1996–97.

At all of the junior high schools combined, the average variance of black students at each school from the district-wide percentage was 27.6% in 1976–77 compared to 16.9% today.

The District has employed a number of measures to achieve desegregation in the five liability schools. We are satisfied that there are no other practicable measures to achieve further desegregation. Based on the above information and all the record evidence, we find that the District has satisfactorily complied with the court's orders regarding student assignments and eliminated the vestiges of past discrimination to the extent practicable in the area of student assignments at Sumner, Northeast, Banneker, Douglass, and Grant schools.

With respect to student assignments at other schools throughout the District, we reaffirm our previous findings that any racial imbalance existing in 1977 at these other schools is not attributable to the defendants. 1977 Order at 69, 85; 1981 Order at 78, 95–96. We find that any racial imbalance existing at these other schools either in 1977 or today has been caused by independent factors such as demographics. There is no evidence that the District has contributed either directly or indirectly to the demographic changes in the area. Thus, the District is not compelled by the Constitution to remedy racial imbalance caused by these independent factors beyond the District's control. *See Freeman,* 503 U.S. at 495, 112 S.Ct. at 1447–48 ("Where resegregation is a product. not of state action but of private choices, it does not have constitutional implications. It is beyond the authority and beyond the practical ability of the federal courts to try to counteract these kinds of continuous and massive demographic shifts."); *Swann v. Charlotte–Mecklenburg Board of Educ.,* 402 U.S. 1, 31–32, 91 S.Ct. 1267, 1283–84, 28 L.Ed.2d 554 (1971) (unless the "school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary").

Although we found in 1977 and 1981, as well as today, that the District's past conduct did not cause or contribute to any racial imbalance in student populations at schools other than the five mentioned above, the District nevertheless has made an effort toward achieving racial balance in these other

2. For example, in 1996–97, the district-wide percentage of "other" minorities was 16.3%. For the same year, the percentage of "other" minorities was 20.7% at Banneker and 43.7% at Pearson.

schools. In 1977, approximately 25% of the District's schools were racially balanced using a 15% variance of the district-wide student population. Today, 36% of the schools are racially balanced using the same standard. The number of "one-race" schools also has declined significantly since 1977. In the 1976–77 school year, approximately 43% of the District's schools had a black or white student population greater than 80%. Today, only 13% of the District's schools have a black or white student population greater than 80%. The District has engaged in a pattern of lawful conduct directed toward ending segregation in student assignments. The significant efforts of the District in addressing student racial balance in schools that were not specifically found to be unconstitutionally segregated in our 1977 or 1981 desegregation orders is commendable and a strong indication of the District's commitment to the Fourteenth Amendment of the United States Constitution.

Our finding of unitary status in the area of student assignments is consistent with the recent holdings of several courts. In *Freeman*, the Supreme Court affirmed the district court's holding that the DeKalb County School System ("DCSS") was unitary with respect to student assignments. 503 U.S. at 496, 112 S.Ct. at 1448–49. The evidence before the district court showed that "(1) 47% of the students attending DCSS were black; (2) 50% of the black students attended schools that were over 90% black; (3) 62% of all black students attended schools that had more than 20% more blacks than the system-wide average; (4) 27% of white students attended schools that were more than 90% white; (5) 59% of the white students attended schools that had more than 20% more whites than the system wide average; (6) of the 22 DCSS high schools, five had student populations that were more than 90% black, while five other schools had student populations that were more than 80% white; and (7) of the 74 elementary schools in DCSS, 18 are over 90% black, while 10 are over 90% white." *Id.* at 476–77, 112 S.Ct. at 1438. Much greater racial balance exists within the Kansas City, Kansas Public Schools. For example, only 28.7% of all black students

attended schools that had 20% more black students than the district-wide average (compared to 62% in *Freeman*). Approximately 21% of all white students attended schools that had 20% more white students than the district-wide average (compared to 59% in *Freeman*).

In 1994, the Southern District of Georgia held that the Savannah Public Schools were unitary with respect to student assignments based on statistical evidence comparable to the evidence presented by the District in the instant action. See *Stell*, 860 F.Supp. at 1585. In *Stell*, the school district's remedial plan included a majority-to-minority transfer program and magnet programs. The school district's goal under the remedial plan was to achieve racially balanced schools so that the percentage of both black and white students at each school fell within 20 percentage points of the district-wide percentage of black and white students. 860 F.Supp. at 1569–70 n. 16, 1571. The school district achieved 99% of the targeted enrollment for its magnet programs and 110% of the targeted enrollment for its majority-to-minority transfer program. *Id.* at 1570. Although several schools failed to achieve the specific goal of a 20 percentage point variance, the court noted that a few of these schools were within one or two percentage points of the goal. *Id.* at 1573. The court also found that those schools with greater deviations could not meet the goal primarily due to demographics and that no practicable measures existed to bring these schools within the 20 percentage point variance goal. *Id.* at 1574–75.

In *Tasby v. Woolery*, 869 F.Supp. 454 (N.D.Tex.1994), the court held that the Dallas Independent School District had achieved unitary status with respect to student assignments, despite an increase in the number of one-race schools and predominately minority schools since the court's desegregation decree. *Id.* at 461. The school district implemented various remedial measures, including redrawing attendance zones, majority-to-minority transfers, magnet schools, curriculum transfers, and an honors program. *Id.* at 461–66. The court found that there were no further reasonable measures that could be taken to achieve racial balance. *Id.* at 461.[3]

---

3. Although the court in *Tasby* declared the school system unitary, the court retained jurisdiction of

the case for a three year "monitoring period." 869 F.Supp. at 477–78.

The Kansas City, Kansas Public Schools also have achieved unitary status in the area of student assignments. The District has employed a number of measures ordered by the court, including pairing of several elementary schools, redrawing attendance zones, a secondary school reorganization, closing some schools, majority-to-minority transfers, magnet schools, child care transfers, and the creation of a college preparatory program at Sumner. We find that the District has complied with the court's order and taken all practicable measures to eliminate the remnants of its prior dual school system with respect to student assignments.

## II. Faculty And Staff Assignments.

Prior to 1954, in furtherance of the District's dual system, the District intentionally segregated its teaching faculties. Actually, the completely segregated faculty and staff of each school mirrored the racial composition of the student body. 1977 Order at 33; 1981 Order at 39. From 1954 to 1963, faculty and staff members remained segregated. White faculty and staff members were assigned to schools with all-white faculty and black faculty and staff members were assigned in every case to schools with all-black faculty. 1977 Order at 33; 1981 Order at 39. The race of each segregated faculty continued to correspond to the predominant race of the student population in each school. Some integration of the faculty began to occur in 1963 but the District's progress was unsatisfactory as of 1977 when the court issued its first desegregation order. In that order, we concluded that despite significant progress in the area of faculty integration "the defendants have not yet succeeded in purging the remnants of their former dual assignment policy from the district's schools and that the Constitution compels the process of dismantlement to be completed at the earliest practicable date." 1977 Order at 43, 45; *see* 1981 Order at 50-51.

In our remedial desegregation decrees, we declined to order the defendants to undertake any specific measures, but we emphasized that the District had a continuing duty to achieve faculty racial balance and to obliterate the racial identifiability of schools by reference to the predominant race of their respective faculties. *See* Feb. 14, 1977 Order at 45; June 8, 1977 Order at 39-41; 1981 Order at 119. In 1977, the District had its own guideline of achieving within each school, a percentage of black and other minority faculty which approximated, within five percentage points, the district-wide percentage of such faculty, respectively, on the elementary and secondary levels. We held that such a goal was reasonable and offered the realistic promise of attainment. 1977 Order at 46. Later, the goal at the elementary level was modified to have the percentage of black and white teachers in every school within five percentage points of the overall percentage of black or white teachers in the district. In addition, a school with a small faculty was considered racially balanced if the addition or subtraction of a single teacher would put the school within the 5% goal. At the secondary level, the goal also was 5% but the exception for small faculties extended to schools where the addition or subtraction of two faculty members would put the school within the 5% goal.

In our original desegregation orders, we primarily expressed concern over the significant correlation between the predominant race of the faculty and the predominant race of students at schools with 75 to 100% white students and 75 to 100% black students. 1977 Order at 45; 1981 Order at 51. At the beginning of the 1996-97 school year, no school had a white student population greater than 75%, which makes any comparison to schools with white populations greater than 75% in 1977 meaningless. In 1977, the most striking figures of faculty racial imbalance were at the 11 schools with black student populations greater than 75%. All 11 of these schools had a racially imbalanced faculty. 1977 Order at 44, 45; 1981 Order at 50-51. At 10 of the 11 schools, the percentage of black and other minority faculty significantly exceeded the district-wide percentage of such faculty. 1981 Order at 51; 1977 Order at 45. The average variance of black faculty at the 11 schools, compared to the district-wide ratio, was 21.1% with a median variance of 24.9%.

Today, there are 9 schools in the District with black student populations greater than 75%. Only 4 of the 9 schools have racially

imbalanced faculties using the 5% variance standard. Three of these four schools have variances less than 15% from the district-wide percentage of black faculty. The fourth school, Douglass, has a variance of 21.8%, which is less than its variance of 28.9% in 1976–77. Further, the average variance of the 9 schools with black student populations greater than 75% in the 1996–97 school year was 6.7% with a median variance of only 3.2%. The following chart also illustrates the District's significant progress in achieving faculty racial balance at schools with black student populations greater than 75% either in 1976 or 1996.

*Percent Variance Of Black Faculty Members From District–Wide Ratio* [4]

| School | 1976–77 | 1996–97 |
| --- | --- | --- |
| Banneker | 26.8* | –2.4 |
| Douglass | 28.9* | 21.8* |
| Grant | 5.6* | 2.8 |
| Hawthorne | 10.9* | 3.2* |
| Quindaro | 26.5* | 7.7* |
| Bryant | 26.4* | closed |
| Fairfax | 15.4* | 2.9* |
| Sumner | 23.3* | –8.3 |
| Northeast | 32.1* | closed |
| Northwest | 21.9* | 13.3* |
| Schlagle | | 1.0* |
| Chelsea | | 1.0* |
| Lindbergh | | –1.9* |
| Parker | –14.9* | 7.7* |

* = greater than 75% black student population during school year.

Faculty racial balance has been achieved throughout the District to the extent practicable. For the 1996–97 school year, five of the District's thirteen secondary schools had black faculties within five percentage points of the district-wide percentage of black faculty members. Six additional secondary schools would meet the 5% goal with the addition or subtraction of only two black faculty members. At the elementary level, eighteen of the District's thirty-three schools have black faculties within five percentage points of the district-wide percentage of black faculty members. An additional eleven

schools would meet the 5% goal with the addition or subtraction of a single black faculty member.

We found in our original desegregation orders that the defendants were not, at the time of trial, engaged in racial discrimination in the selection, promotion, and placement of minority-race administrative staff personnel. 1977 Order at 47; 1981 Order at 53. Nevertheless, the District has made substantial progress in hiring black administrators. In 1977, Blacks comprised approximately 29% of the District's building level administrators compared to 42.5% today. Black administrators also are more prevalent in central office administrative and supervisory positions. In 1977, Blacks were employed in less than 1% of such administrative positions. In 1997, Blacks are employed in approximately 18% of such positions. In addition, the District currently recruits potential faculty and staff members at a number of colleges with large minority student populations.

The leading case on desegregation of school faculty and staff is *Singleton v. Jackson Mun. Separate School Dist.*, 419 F.2d 1211, 1218 (5th Cir.1969), *rev'd in part on other grounds*, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970). In *Singleton*, the Fifth Circuit required several school districts to desegregate faculty and staff as part of a remedial order. The court required the school districts to assign faculty and staff so that the racial composition of a staff in each school does not indicate that the school is intended for black or white students. *Id.* Further, the court required that the school districts assign faculty and staff to individual schools in proportions "substantially the same" as the racial balance of faculty and staff district-wide. *See id.; Swann*, 402 U.S. at 19, 91 S.Ct. at 1277–78. The Fifth Circuit emphasized two other requirements for faculty assignment. First, the school district must make all faculty employment decisions without regard to race, color, or national origin. Second, any reduction in faculty shall involve the selection of individuals "on the

---

**4.** Variance = (% black faculty at school)—(district-wide % of black faculty at type of school, *i.e.*, secondary or elementary). In 1976–77, the district-wide percentage of black faculty members was 24.3% at the secondary level and 32.9%

at the elementary level. In 1996–97, the district-wide percentage of black faculty members was 23.67% at the secondary level and 24.42% at the elementary level.

basis of objective and reasonable non-discriminatory standards from among all the staff of the school district." *Singleton,* 419 F.2d at 1217–18.

The District here meets the requirements of *Singleton.* The District's self-imposed 5% variance' (with slight modifications for smaller faculties) for each school is quite stringent compared to various court-adopted goals for desegregation of faculty and staff. *See Mills,* 942 F.Supp. at 1455 (15% variance); *Tasby,* 869 F.Supp. at 472 (15% variance); *Dowell v. Board of Educ.,* 778 F.Supp. 1144, 1175–76 (W.D.Okla.1991) (20% variance), *aff'd,* 8 F.3d 1501 (10th Cir.1993); *Flax v. Potts,* 725 F.Supp. 322, 329 (N.D.Tex. 1989) (20% variance), *aff'd,* 915 F.2d 155 (5th Cir.1990); see *also Singleton,* 419 F.2d at 1218 (school districts under desegregation orders must assign faculty and staff to individual schools in proportions "substantially the same" as the racial balance of faculty and staff district-wide). The District has made substantial progress with respect to faculty and staff desegregation since 1977. Several courts have declared faculty and staff assignment systems unitary with greater variances than the District's current system. *See Flax v. Potts,* 915 F.2d 155, 163 (5th Cir.1990); *Mills,* 942 F.Supp. at 1455–56; *Stell,* 860 F.Supp. at 1584; *Dowell,* 778 F.Supp. at 1175–77.

In *Flax,* the Fifth Circuit affirmed the district court's finding that the Fort Worth Independent School District had eliminated all discrimination with respect to faculty and staff assignments. *Id.* at 163. The school district acknowledged on appeal that six schools in the district did not comply with the required ratio of black-to-white faculty members. *Id.* The school district presented evidence, however, that a change of one or two faculty members at each school would restore the ratio. *Id.*

In *Stell,* the School Board of the Savannah Public Schools offered evidence that the percentage of black faculty at 43 of 44 schools was within 15 percentage points of the district-wide black faculty average. 860 F.Supp. at 1584. The one remaining school had a 21 percent variance. The parties did not dispute that staff, principals, and assistant principals had been assigned in a non-discriminatory manner. The district also

was recognized for its efforts in recruiting and hiring black faculty and staff members. Further, in 1994, approximately 40% of the district's staff and faculty were black. The court declared that the faculty and staff assignment system was unitary and that all vestiges of past discrimination had been eliminated to the extent practicable. *Id.*

In *Mills,* no school over the past four academic years "with either the lowest or highest percentage of black staff members varied more than 15 percentage points from the system-wide average for the type of school under consideration." 942 F.Supp. at 1456. Further, a steady increase in the number of black staff members throughout the school system was discernable. *Id.* The court concluded that the district satisfied the *Singleton* test for faculty assignments. *Id.*

The defendant District has achieved comparable success in the desegregation of its faculty and staff. As noted above, the percentage of black faculty members in nearly all of the District's schools is within or near the strict 5% variance standard. From all of the above evidence, we conclude that the District has satisfactorily complied with our orders regarding faculty and staff assignments, the District's assignment of faculty and staff no longer contributes to the racial identifiability of any school, and that any remnants of past discrimination have been eliminated to the extent practicable.

### III. Transportation.

The District must establish that its school system is unitary with respect to transportation. *See Green,* 391 U.S. at 435, 88 S.Ct. at 1692–93. In *Tasby,* the school district presented evidence that it provides transportation to students on a non-discriminatory basis, free transportation is provided to all students who reside more than two miles from their assigned school, and to all majority-to-minority transfer students, curriculum transfer students, and magnet students. 869 F.Supp. at 475. The school district also provided transportation for extracurricular activities on demand to majority-to-minority transfer students and magnet students. *Id.* Based on this evidence, the court declared

that the school system was unitary with respect to transportation. *Id.* at 476.

In the instant case, the District has provided transportation to students on a non-segregated basis. The District currently provides free transportation for elementary students who reside more than 1 mile from their school of assignment, middle school students who reside more than 1.25 miles from their school of assignment, and high school students who reside more than 1.5 miles from their school of assignment. In addition, the District provides free transportation for students where it is deemed necessary to achieve racial balance and for child-care reasons. The District provides additional transportation from schools for students who meet the above standards but participate in extracurricular activities.

The District's remedial efforts have been accomplished so no identifiable group of students is singled out for transportation to school. The magnet and option programs have been distributed equitably throughout the community. Students and parents, not the District, primarily decide which school they will attend and how far it is reasonable to travel to school. The District's current transportation policy certainly is not a vestige of its prior segregative practices. Rather, we believe that the District's transportation policy has been used effectively to eliminate the remnants of segregation in other areas such as student assignments. *See Dowell,* 778 F.Supp. 1144, 1177 (W.D.Okla.1991) ("far from being a *vestige* of prior segregation, transportation was actually the principal tool utilized to eliminate prior segregation."). We find that any vestiges of past discrimination in transportation have been eliminated to the extent practicable.

## IV. Extracurricular Activities.

A school district also must establish that its school system is unitary with respect to extracurricular activities. *See Green,* 391 U.S. at 435, 88 S.Ct. at 1692–93. "[A] school district's extracurricular activities are unitary if they 'are available to all students within the School District regardless of race.'" *Coalition to Save Our Children v. State Bd. of Educ. of the State of Del.,* 90 F.3d 752, 768 (3d Cir.1996) (quoting *Single-*

*ton v. Jackson Mun. Separate School Dist.,* 541 F.Supp. 904, 908 (S.D.Miss.1981)); see *Quarles v. Oxford Mun. Separate School Dist.,* 868 F.2d 750, 757–58 (5th Cir.1989) (finding unitary status in extracurricular activities where the school district had non-discrimination policy and administration encouraged faculty of both races to serve as activity sponsors).

The District meets the requirements of a unitary school system with respect to extracurricular activities. The District has non-discrimination policies which govern access to academic programs and extracurricular activities. The District also offers a wide variety of extracurricular activities and the District's faculty and staff encourage maximum participation from all students. Further, the District provides additional transportation regardless of race for students who are eligible for transportation but are involved in extracurricular activities. We find that no vestiges of past discrimination remain in this area.

## V. Facilities.

The court's original desegregation orders did not find any variation in the quality of facilities provided to black and white students. Student population has been declining in the district. In September 1975, there were 29,725 students. Today, there are 21,-456. Accordingly, the District has requested and we have approved the closing and consolidation of several schools since 1977. The District has requested school closings in an equitable fashion. The District's schools are fairly distributed where the population is concentrated, which helps equalize the transportation burdens on the various segments of the population.

The District also has conducted a detailed equity study which evaluates to what degree the District's schools are capable of providing a modern education for all students. We find no discernable difference in the quality of facilities at schools in predominately black neighborhoods and the quality of facilities at schools in other parts of the District. In addition, the District has conducted an architectural analysis of all facilities and an analysis of how well each facility supports its educational programs. Based on these stud-

ies, the District plans to make several modifications in the upcoming years to ensure equality in the facilities of its schools. Any vestiges of segregation with respect to facilities have been eliminated to the extent practicable.

## VI. The District's Desegregation Exit Plan And Good Faith Commitment To Desegregation.

■ We next turn to whether the District has demonstrated that it will continue its good faith commitment to the Fourteenth Amendment of the United States Constitution. "Mere protestations of an intention to comply with the Constitution in the future will not suffice. Instead, specific policies, decisions, and courses of action that extend into the future must be examined to assess the school system's good faith." *Brown,* 978 F.2d 585, 592 (10th Cir.1992). We must be convinced that the District will remain committed to the ideals of desegregation of its school system. *See Dowell,* 498 U.S. at 247, 111 S.Ct. at 636–37 (court must find "that it [i]s unlikely that the school board would return to its former ways."); *Brown,* 978 F.2d at 592 (same).

A school district can establish its good faith commitment to future desegregation in several ways. "A comprehensive plan, adopted and followed by the school board, aimed at eliminating the vestiges of segregation to the system would be evidence of good faith; so might a school board resolution declaring the school board's intention to comply with the Constitution in the future but only if coupled with affirmative efforts across time." *Brown,* at 592 (citing *Lee v. Talladega County Bd. of Educ.,* 963 F.2d 1426, 1428 (11th Cir.1992), *cert. denied,* 507 U.S. 910, 113 S.Ct. 1257, 122 L.Ed.2d 655 (1993)). "A history of good-faith compliance is evidence that any current racial imbalance is not the product of a new de jure violation, and enables the district court to accept the school board's representation that it has accepted the principle of racial equality and will not suffer intentional discrimination in the future." *Id.* at 498–99, 112 S.Ct. at 1449 (citing *Morgan v. Nucci,* 831 F.2d 313, 321 (1st Cir.1987)).

Here, the District's "policies form a consistent pattern of lawful conduct directed to eliminating earlier violations." *Freeman,* 503 U.S. at 491, 112 S.Ct. at 1449. The District's conduct since 1977 demonstrates that it is committed to the principles of *Brown v. Board of Education* and the Fourteenth Amendment. The District has diligently implemented the desegregation plan approved by the court and sought appropriate modifications as necessary. There is no record evidence which suggests any bad faith on the District's part in implementing the desegregation plan. We are confident that the principle of racial equality is engrained within the fabric of the school system.

The Exit Plan proposed by the District is the result of the efforts of numerous individuals from the District, the Department of Justice, and the local community. Approximately 150 community members, in addition to those individuals directly connected to the District, participated in the formulation of the Exit Plan. The Exit Plan is the result of three separate planning processes: The District Improvement Plan, The First Things First Program, and The Redistricting Plan. The Exit Plan was adopted after public comment and consideration of many different options. The government states that the "Defendants gave full consideration to and relied upon the expertise of Department of Justice school planners in adopting a comprehensive planning process that included intense scrutiny into the District's programs, facilities, and demographics." The government also notes that, although it helped develop the framework for preparing a plan, the District, including the administration, faculty, parents, students, and community members, actually prepared the details of the Exit Plan. Notably, the Exit Plan goes significantly beyond the scope of our remedial orders in this case and addresses the entire school system. The District has summarized the Exit Plan as follows:

1. Designates the Wyandotte High School cluster (Wyandotte High School, Central and Northwest middle schools, and Banneker, Chelsea, Douglass, Fairfax, Hawthorne, Mark Twain, M.D. Pearson, Roosevelt, and Whittier Elementary Schools) as the first set of schools for implementation of First Things First and a project emphasizing

mathematics, science, and technology. Other schools, by cluster, will follow over a three-year period. The Wyandotte High School science lab, along with science labs in the other high schools in the district, will also be remodeled to meet the rigorous standards of a revised curriculum.

2. Transforms Banneker Elementary School into a magnet school emphasizing science and technology in order to attract a more diverse student body.

3. Establishes, by the year 2000, a magnet program at Northwest Middle School. This program is designed to supplement the magnet properties of the Banneker magnet program and, together with Wyandotte High School, provides an integrated science and technology curriculum from K–12, Banneker through Wyandotte.

4. Eliminates the three sets of "paired" elementary schools—Banneker and M.E. Pearson; Douglass and Frances Willard; and Grant and John Fiske. Students in those attendance areas will now attend their neighborhood schools. Banneker will be transformed into a science and technology neighborhood/magnet school. Douglass will continue its participation in the Basic Schools program, enhancing the educational opportunities for those students. Through redistricting, Grant will become an integrated, and indeed racially balanced, neighborhood school.

5. Eliminates middle and high school non-contiguous attendance boundaries in the northeast area. Throughout the District, students will be assigned to "pure" feeder patterns from elementary to middle to high school.

6. Closes four elementary schools, but makes facilities available for other community needs.

7. Eliminates overcrowding at several elementary schools by changing boundaries and undertaking some renovation and expansions of existing elementary schools.

8. Eliminates racial balance transfers at the middle school level and changes eligibility standards for such transfers for elementary students.

9. Implements new admissions standards for Sumner Academy of Arts and Science to reflect current research on identification of academically talented students.

10. Phases out current magnet themes at the four high schools with the expectation that each school will reinvent its magnet in collaboration with the community as a part of the restructuring process.

11. Includes additional resources and program enhancements for schools with the highest concentrations of poverty.

At almost every stage of the planning process, the government and the District considered the impact of the various proposals on racial balance. Indeed, the Exit Plan was "designed to improve the state of the District's educational opportunities by improving facilities and programs for the students. This objective may be achieved, in part, by and through schools that are racially balanced." In addition, the Board of Education has adopted a resolution which provides that they will (1) continue to operate the District in a manner which comports with the commands of the Fourteenth Amendment of the United States Constitution, (2) implement in good faith the Exit Plan, and (3) reject any course of action which establishes a racially dual school system. The District also will conduct periodic reviews and assessments of the Exit Plan to ensure its compliance with educational and desegregation objectives. The District's review process allows for public comment and suggestions and is scheduled to continue beyond the initial five years of the Exit Plan.

The Exit Plan shows that the District truly is committed to both quality education and desegregation. The District has measured the impact of the Exit Plan on student racial balance. Based on the new attendance zones under the Exit Plan, the District estimates that the percentage of racially balanced elementary schools will increase from 36% to at least 38%, the number of racially balanced middle schools will increase from three to

five, and that the number of racially balanced high schools will increase from two to three. In addition, if black and Hispanic students are considered as one group, then all four of the high schools would be racially balanced under the Exit Plan.

The Exit Plan also adequately addresses racial balance at the five schools that we previously found were intentionally segregated. First, the District plans to enhance the admissions criteria for Sumner Academy under the Exit Plan. The District believes that the new admissions criteria, along with other efforts at both the elementary and middle school level, will strengthen the student profile at Sumner and also increase the number of black students attending Sumner.

Pairing of elementary schools would be eliminated under the Exit Plan. The District proposes to make Banneker a magnet elementary school emphasizing science and technology. Banneker also would be used as a teaching and developmental academy for instructors wishing to pursue innovative teaching strategies which require advanced technology. The District estimates that Banneker will remain racially balanced with approximately a 63% black student population.

With the new attendance zones and elimination of "paired" schools, Grant Elementary School's black student population would decrease from 71.5% to 58%. On the other hand, the black student population at Douglass Elementary would increase from 78% to 84%. The net effect on racial balance in these two schools combined is insignificant. If pairing of the elementary schools was eliminated without redrawing attendance zones, Douglass would have a black student population of 91%. The District proposes to change attendance boundaries in part to reduce the racial imbalance that would result at Douglass with the elimination of paired schools. We believe that the District has properly considered the burdens of the paired school system, the benefits of neighborhood schools, and the goals of desegregation. The District already has eliminated the remnants of its dual school system. Thus, to establish good faith, the District does not have to demonstrate that it will blindly pursue student racial balance over all educational goals. *See Freeman*, 503 U.S. at 494, 112 S.Ct. at 1447–48 ("Racial balance is not to be

achieved for its own sake. It is to be pursued when racial imbalance has been caused by a constitutional violation."); 1977 Order at 15 ("the Constitution does not require that all neutral, nonracial, educational, geographical, and political considerations—which so vitally affect the nature and quality of public school systems—give way to overzealous pursuit of the single goal of desegregation."). In light of the entire Exit Plan, a slight increase in student racial imbalance at Douglass does not indicate any lack of respect by the District for the principle of racial equality. Indeed, the District has focused educational reform efforts in part at Douglass. Douglass is now one of 16 schools in the Nation participating in the Basic Schools Program.

The District closed Northeast Junior High School in 1977 pursuant to our initial desegregation order. Northwest is the closest middle school to the former Northeast school. Northwest has been designated as a magnet school under the Exit Plan. The Northwest magnet program is designed to complement the science and technology theme at Banneker Elementary and provide a transition to Wyandotte High School. Wyandotte High School has been selected as the first recipient of programming initiatives derived from the National Science Foundation. Thus, the technology magnet theme will extend from kindergarten through twelfth grade. We also note that the technology magnet theme will be integrated in the Wyandotte High School cluster which includes Banneker, Douglass, and Grant attendance areas, as well as several schools which have a predominately black student population.

The Exit Plan also will continue racial balance transfers to some extent. The Exit Plan will permit such transfers for students attending elementary schools with a student population that is 15 or more percentage points above the district-wide average of their race or ethnic group. The students can transfer, as space is available, to schools where the percent of students of their race or ethnic group is at least 15 percentage points below the district-wide average.

Since 1977, the District consistently has attempted to achieve a racially balanced fac-

ulty and staff. The District's goal remains to achieve within in each school a percentage of white and black faculty which approximates within five percentage points of the district-wide percentage of such faculty with slight modifications for small faculties. The District has shown a good faith commitment to have a racially balanced faculty and staff.

We also find that facilities are provided to students regardless of race under the Exit Plan. After implementation of the Exit Plan, only 45% of the children in schools with inadequate space (less than 90 square feet per student at the elementary level) will be black, only 40% of the children in schools that opened prior to 1930 will be black, 58% of the students in schools that have air conditioning will be black, approximately 50% of the students in schools with inadequate space for the library/media center will be black, approximately 50% of the students in schools with inadequate space for art and music education will be black. The district-wide percentage of black students in 1996–97 was approximately 54%.

We also have reviewed the Exit Plan with respect to transportation, extracurricular activities, and quality of education. We find no discernable segregative effect in these areas.

After reviewing the testimony at the hearing, as well as all of the record evidence, we find that it is highly unlikely that the District will return to its segregative past.

### Conclusion

The court's task in a school desegregation case is to both remedy the effects of past discrimination and ensure that a school system does not return to its segregative past. The court's task is nearly complete after twenty years of supervision of this district. The court's task was infinitely easier because of the cooperation between the parties and attorneys constantly displayed since 1981. The parties and attorneys have gone to great lengths to avoid conflicts over many peripheral issues. Instead, they have focused their time and efforts on developing quality educational programs in the District while recognizing the principle of racial equality. In particular, the unprecedented collaborative efforts of the Department of Justice and the District since 1994 have produced the Desegregation Exit Plan which will provide the framework for operation of a unitary school system in the future. The attorneys and parties are to be commended.

We recognize that court supervision over the District has been difficult and cumbersome for many individuals. Numerous members of the administration and faculty, as well as parents and students, often at considerable personal sacrifice and inconvenience, have worked diligently to ensure the court's decrees were implemented. Led by strong and dedicated administrators and supported by a Board of Education equally committed, the District consistently moved toward this day when court supervision could be lifted. Many times the Board of Education had to make difficult decisions such as school closings because of the changing demographics and needs of the community, and to comply with the court's orders. As a result, many teachers, parents, and students were impacted. Despite these difficulties, the District, with the strong support of the Board, truly has chartered a course of commitment to the Fourteenth Amendment of the United States Constitution and the principles underlying *Brown v. Board of Education.* Indeed, the District in many respects has gone beyond the scope of our remedial orders in an effort to achieve racial balance throughout the entire school system. The thorough manner in which this Plan has been developed has made this court's task relatively easy. This comprehensive Exit Plan could well be a model for other courts and school districts of the type of planning process that can lead to the orderly withdrawal of judicial supervision in a school desegregation case.

The present school system in Kansas City, Kansas, stands in stark contrast to the dual race system that existed before 1954. Through the persistence of the Board of Education and the administration, the court is satisfied that the principle of equality among all students now flourishes in the District. Although the District surely will face other challenges in providing a high quality education to students, we hope that the final resolution of this case will illustrate a productive way to approach those challenges. This case was not resolved in the courtroom with the testimony of star wit-

nesses or the eloquent statements of attorneys. Rather, the administration, faculty, parents, students, and the community found their own answers through detailed planning, cooperation, and participation.

IT IS THEREFORE ORDERED that defendants' motion for declaration of unitary status and order of dismissal (Doc. # 389) is granted.

IT IS FURTHER ORDERED that all injunctions in this case are dissolved.