[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 99-12049

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 19, 2001
THOMAS K. KAHN
CLERK

D.C. Docket No. 85-00316 CIV-J-10C


NAACP, JACKSONVILLE BRANCH,

Plaintiff-Appellant,

versus

DUVAL COUNTY SCHOOL,

Defendant-Appellee.


_____

Appeal from the United States District Court for the
Middle District of Florida

_____

**(November 19, 2001)**


Before BARKETT, HILL and KRAVITCH, Circuit Judges.

HILL, Circuit Judge:

Forty-one years ago, this litigation began. The original complaint sought the desegregation of the Duval County, Florida school system. Five district court judges have presided over the case since its inception, and, four times, two different circuit courts of appeals have been asked to review one of their decisions.[1] In this fifth appeal, we must decide whether the present district court correctly determined that this litigation should come to an end because the school system has achieved unitary status. We agree with the district court that the answer is "yes."

## I.

The original complaint in this case was filed on December 6, 1960. *See Braxton v. Bd. of Pub. Inst. of Duval County.*[2] It sought an injunctive order desegregating the Duval County public schools. In 1963, after a finding that the county was operating a *de jure* dual school system, in which black and white children were required to attend separate schools, the district court began supervising the desegregation of the county's schools.

In 1971, after the Supreme Court held that mandatory busing of students to eliminate racial disparities was a permissible, and sometimes necessary,

---

[1] The appeals filed prior to 1981 were heard by the Court of Appeals for the Fifth Circuit. After the split in 1981, the appeals have been heard by this court.

[2] For a variety of reasons, the case name has changed over time.

desegregation remedy, *Swann v. Charlotte-Mecklenburg Bd. of Educ.,* 402 U.S. 1, 22 (1971), the district court ordered the Duval County School Board (the "Board") to implement the mandatory reassignment of students. *Mims v. Duval County Sch. Bd.,* 329 F. Supp. 123 (M.D. Fla. 1971). Elementary and junior high schools were clustered into groups which were converted to grade centers to produce student bodies with 21% to 34% black students. *Id.* at 134-35. Students were bussed within each cluster to achieve the mandated racial balance. *Id.* at 130-31.

The judgment was affirmed on appeal, 447 F.2d 1330 (5th Cir. 1971) and, as amended from time to time, primarily to accommodate the opening of new schools, the decree governed the parties for the remainder of the 1970's and well into the 1980's.[3]

During the pendency of the *Mims* injunction over the next 19 years, every school in the entire school district, which previously had been all-black or all-white, had substantial numbers of students of the other race in attendance for one or more years. By 1989, only 18 of the 142 schools operating in Duval County

---

[3]In 1986, the district court dissolved the *Mims* injunction because it found that the Duval County school system had achieved unitary status. On appeal, we found no fault with the district court's finding of unitary status with respect to the areas of extra-curricular activities and transportation, but that further efforts were necessary in administrative staff, teacher and student assignments. *Jacksonville Branch, NAACP v. Duval County Sch. Bd.,* 883 F.2d 945 (11th Cir. 1989).

were identifiably black.[4]

By 1990, however, both plaintiffs and the Board had come to the conclusion that mandatory busing was particularly onerous to the students of Duval County and not in their best interests.[5] After almost thirty years of litigation, the parties entered into settlement negotiations. They agreed that mass busing should come to an end. They also agreed that future desegregative efforts by the Board should focus almost entirely upon the elementary schools.[6] Finally, they agreed that they wished to measure the Board's success in achieving unitary status by the goals outlined in the "Stipulation and Agreement," filed on June 18, 1990.[7] After some technical corrections and refinements, the "Corrected Stipulation and Agreement" (the "CSA") was established as the defining document outlining the goals that the

---

[4]By agreement of the parties, an identifiably black school has a student body over 75% black.

[5]Duval County operates one of the largest school districts in the nation, consisting of 851 square miles, a geographic region representing two-thirds the size of Rhode Island. Additionally, the county is separated by a large river and several smaller rivers causing some sections of the city to be isolated from other parts. The transporting of students over the rivers and the sheer size of the county significantly increase the difficulty of busing in Duval County.

[6]A majority of the middle and high schools were already in compliance with the student enrollment goals the CSA would establish and there were more racially identifiable elementary schools.

[7]While none of these mutual goals was expressly stated in the Agreement, we agree with the district court's finding that all are clearly implicit in it, and were also expressed explicitly in the Pretrial Statement filed by the parties prior to the hearing on unitary status, the arguments of counsel and the evidence presented at the hearing.

4

Duval County School Board (the "Board") must achieve in order to attain unitary status.[8]

The CSA, thus, represents a roadmap to the end of judicial supervision of the Duval County school system. Its 33 paragraphs contain a series of steps which the Board agreed to undertake to achieve unitary status for the school district.[9] Most of these steps are addressed to attaining greater racial balance in student enrollment in the county's schools, especially its elementary schools.

"Attachment C" to the CSA lists 28 elementary schools that the parties expected to become identifiably black with the end of the *Mims* injunction's mandatory student assignment and bussing. Prior to the injunction, thirteen of

---

[8]This appeal seeks a determination that the goals of the CSA have not been met.

[9] The CSA is 25 pages in total length, including attachments, containing 33 paragraphs roughly divided as follows: (a) paragraphs 1-10 incorporate the broad goals, purposes, and time frame informing the intent of the parties in the CSA implementation process; (b) paragraphs 11-17 address requirements pertaining to Attachment C schools (identifiably black elementary schools); (c) paragraphs 18-19 address requirements pertaining to Attachment D schools (identifiably white elementary schools); (d) paragraph 20 addresses requirements pertaining to Attachment E schools (naturally integrated schools based on integrated housing patterns); (e) paragraphs 21-22 contain additional requirements pertaining specific middle schools; (f) paragraph 23 contains additional requirements pertaining to specific high schools; (g) paragraph 24 addresses issues surrounding new school site selection and construction and requires the formation of a facilities committee consisting of representatives of both parties and members of the community; (h) paragraph 25 requires the development of detailed plans to achieve non-discriminatory operational procedures; (i) paragraphs 26-27 require the attainment of faculty and staff hiring goals as set forth by the *Mims* injunction; (j) paragraph 28 requires the Board to take steps to increased black student and faculty representation in the gifted program; (k) paragraph 29 requires a re-evaluation of black students classified as mentally retarded; (l) paragraphs 30-33 establish the Board's affirmative obligation to desegregate "to the maximum extent practicable" and that unitary status shall not be achieved until the Board maintains three years of racial equality in all areas of school operation.

5

these schools had been all-white; fifteen had been all-black.  During the years of mandatory student assignment,  *all* the Attachment C schools were attended by students of both races.  After mandatory student assignment was replaced with the CSA's "local attendance zones," these schools became identifiably black because their attendance zones had become 96% black.[10]  The parties, therefore, directed much of the CSA to improving the racial balance at these schools.[11]

The CSA established "a desegregative goal of at least 20% black students and 45% white students"[12] at these Attachment C elementary schools.[13]  The Board was required, with community input, to implement and aggressively promote magnet programs[14] as incentives to attract white students to these schools.  In

---

[10]A declining white student population during the *Mims* years caused the elementary schools that had formerly been operated solely for white students under state-mandated segregation to become identifiably black schools.  See discussion in section III. B. *infra*.

[11]One school originally listed in Attachment C, is not included in this discussion because it is located at the beach in a zone that Attachment C was not supposed to include.

[12]The NAACP's expert witness testified that, in practice, this formulation means a black student enrollment of 20% to 55%.  Some schools at the outer geographic areas of the county – the beaches and the far west – were given a goal of within +/- 10% of the zone-wide racial composition at its grade organization level.

[13]The district court found that the CSA requires only the elementary schools listed in Attachment C to achieve these numerical goals because they applied only to schools in Zones I-V, which include only elementary schools.  The NAACP argues that these goals apply to all schools in the district.  The issue is really of no moment since both the district court and the Board have used these benchmarks to measure the racial enrollment effects of the middle and high school magnet programs.

[14]"Magnet schools, as generally understood, are public schools designed to promote integration by voluntarily drawing students away from their neighborhoods and private schools

6

addition, the CSA required the Board to permit majority to minority transfers in order to improve the racial balance at these schools.[15]  The Board was also required to commit $60,000,000 for the "renovation, substantial rehabilitation, or replacement of core city schools."

With respect to middle and high schools, the CSA specifically designated three middle and four high schools, which, based on their attendance areas, were expected to remain or become racially identifiable and directed that they operate magnet programs to attract other-race students.

The CSA also set goals with respect to achieving racial equality in faculty and staff hiring and placement; transportation; extracurricular activities; and facilities and capital expenditures.

On July 14, 1990, the district court approved and adopted the CSA.  It retained jurisdiction to monitor its implementation and to enforce it.

The CSA was implemented during the 1991-92 school year.[16]  In 1996, the

---

through distinctive curricula and high quality."  *Missouri v. Jenkins*, 515 U.S. 40 n.6 (1995).  Under the CSA, the Board was required to establish and maintain magnet programs at "racially identifiable" elementary schools and at several middle and high schools.

[15]The CSA required the Board to "intensively recruit" white and black students to attend opposite race schools and to provide transportation "at no cost" for these students to attend such schools.

[16]Within a year, the NAACP filed a motion to modify the CSA.  Among other requests, it urged the court to require the Board to implement a system of "controlled choice" as an additional desegregative technique.  The district court denied the motion, *Jacksonville Branch, NAACP v.*

7

Board moved the district court to declare that the Duval County school district had met the constitutional requirements for unitary status as set forth by the Supreme Court in *Bd. of Educ. of Oklahoma City Pub. Sch. v. Dowell,* 498 U.S. 237 (1991), *Freeman v. Pitts*, 503 U.S. 467(1992), and *Missouri v. Jenkins*, 515 U.S. 33 (1995), and also that it had fulfilled its contractual obligations under the CSA. After a three-week evidentiary hearing in 1997, and over a year for the preparation of briefs, the case was orally argued on August 24, 1998. In a 140 page opinion that exhaustively catalogued every paragraph of the CSA and carefully evaluated the record evidence of the Board's efforts and success in achieving each paragraph's stated goal, the district court found that the Board had acted in exceptional good faith in its efforts to comply with the CSA and that it had substantially achieved its goals. The court also held that the Board had fulfilled its constitutional obligation to eliminate the vestiges of *de jure* segregation and to desegregate Duval County's schools in good faith and to the extent practicable. Accordingly, the district court declared that the school district was unitary in all respects, vacated all prior injunctions, and dismissed the case. This appeal followed.

---

*Duval County Sch. Bd.*, 978 F.2d 1574 (11th Cir. 1992), and, on appeal, we found no error in the denial as to most of the issues raised, including the refusal to modify the CSA by ordering a "controlled choice" student enrollment program. On two issues, we remanded for a development of the record.

We review the district court's conclusion that Duval County has achieved unitary status for clear error. *Manning v. Sch. Bd. of Hillsborough County*, 244 F.3d 927, 940 (11th Cir. 2001) *petition for cert. filed,* 69 U.S.L.W. 3792 (U.S. June 14, 2001) (No. 00-1871) (unitary status is a finding of fact); *Lockett v. Bd. of Educ. of Muscogee County*, 111 F.3d 839, 841-42 (11th Cir. 1997) (*Lockett II*). Under this standard of review, a district court's findings are entitled to substantial deference. "Where there are two permissible views of the evidence, the [district court]'s choice between them cannot be clearly erroneous." *Manning*, 244 F.3d at 940 (quoting *Lockett II*, 111 F.3d at 842) (internal quotation and citation omitted)). Moreover, only in circumstances when "a district court applies an incorrect legal standard which taints or infects its findings of facts, [do] such findings lose the insulation of Rule 52(a) and judgment based thereon cannot stand." *Id.* at 940-41 (internal quotations and citations omitted). We review the district court's interpretation and application of the law *de novo*. *Id.*

## II.

School boards that formerly operated a *dual* school system, in which black students attended one set of schools and white students another, have been "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a *unitary* system in which racial discrimination would be eliminated root

9

and branch." *Green v. County Sch. Bd. of New Kent County*, 391 U.S. 430, 437-38 (1968) (emphasis added). A unitary system is one in which there is presently no *de jure* racial segregation, and the vestiges of former *de jure* segregation have been eliminated to the extent practicable. *Freeman*, 503 U.S. at 494 ("If the unlawful *de jure* policy of a school system has been the cause of the racial imbalance in student attendance, that condition must be remedied"). Until these goals are achieved, the Supreme Court has ordered district courts to supervise the desegregative efforts of school boards that formerly practiced *de jure* segregation. *Lockett II* , 111 F.3d at 842 (citing *Brown v. Bd. of Educ.*, 349 U.S. 294, 301 (1955)).

To be entitled to the end of federal court supervision, a formerly dual school system must be able to prove that it has (1) complied in good faith with the desegregation decree, and (2) eliminated the vestiges of prior *de jure* segregation to the extent practicable. *Jenkins*, 515 U.S. at 88 (quoting *Freeman*, 503 U.S. at 492). *See also Manning*, 244 F.3d at 942; *Lockett II*, 111 F.3d at 843. In this case, the parties and the district court have agreed that the CSA defines the specific goals the Board must meet and the steps it must take in order to attain unitary status. "For enforcement purposes, consent agreements are interpreted under the principles of contract law . . . . [T]he obligations required of each party to a consent decree must be found 'within its four corners, and not by reference to what might satisfy the

10

purposes of one of the parties to it." *Jacksonville Branch, NAACP v. Duval County Sch. Bd.*, 978 F.2d 1574, 1578 (11th Cir. 1992) (citations omitted).

The Board, of course, must also meet its constitutional obligation to eliminate the vestiges of *de jure* segregation to the extent practicable. In evaluating the Board's fulfillment of this obligation, the district court must examine six areas: (1) student assignments; (2) facilities; (3) faculty; (4) staff; (5) transportation; and (6) extracurricular activities. *Green*, 391 U.S. at 435.[17] Since the Board operated *de jure* segregated schools in the past, there is a presumption that any current racial disparities in these areas are the result of its past unlawful conduct. *Keyes v. School Dist. No. 1*, 413 U.S. 189, 208-09 (1973). The Board "bears the burden of showing that any current imbalance [in these areas] is not traceable, in a proximate way, to the prior violation." *Freeman*, 503 U.S. at 493. *See also Lockett II,* 111 F.3d at 843 (district court must presume that substantially disproportionate racial compositions within the schools is constitutionally violative) (citing *Swann*, 402 U.S. at 25).

This presumption may, however, be overcome. The Supreme Court has recognized that some racial imbalances in our schools today are caused by external

---

[17]The parties have established a very detailed set of specific requirements in the CSA's thirty-three paragraphs. The district court carefully analyzed the Board's achievement of each of these requirements. See section III *infra*.

11

forces, such as demographic shifts, which are not the result of segregation and which are beyond a school board's control.  *See Jenkins*, 515 U.S. at 102; *Pasadena City Bd. of Ed. v. Spangler*, 427 U.S. 424,434 (1976); *Swann,* 402 U.S. at 22.  If a school board can prove that such factors have substantially caused current racial imbalances in its schools, it overcomes the presumption that segregative intent is the cause, and there is no constitutional violation. *Id.  See also Manning*, 244 F.3d at 944; *Lockett II*, 111 F.3d at 843.

Where there is no constitutional violation, a school board is under no duty to remedy racial imbalances.  *Id.*  The Supreme Court has made clear that:

> Racial balance is not to be achieved for its own sake.  It is to be pursued when racial imbalance has been caused by a constitutional violation.  Once the racial imbalance due to the *de jure* violation has been remedied, the school district is under no duty to remedy imbalance that is caused by demographic factors.

*Freeman*, 503 U.S. at 494.  *See also Manning*, 244 F.3d at 941.

Furthermore, even when remedying the effects of *de jure* segregation, the Constitution does not require rigid racial ratios.  "The purpose of federal supervision is not to maintain a desired racial mix at a school."  *Manning*, 244 F.3d at 941 (citing *Pasadena*, 427 U.S. at 434-37 and *Freeman*, 503 U.S. at 494).  "The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the

12

school system as a whole." *Swann,* 402 U.S. at 23-24.  Such a goal would require

federal supervision in perpetuity.  On the contrary, a complete return to local

control of school systems is the ultimate goal of all judicial supervision because

"[f]rom the very first, federal supervision of local school systems was intended as a

temporary measure to remedy past discrimination," and desegregation decrees "are

not intended to operate in perpetuity." *Dowell*, 498 U.S. at 247-48. *See also*

*Manning*, 244 F.3d at 942 n.25.

We turn now to our review of the district court's determination that the time

has come to return control over its school system back to Duval County.

III.

A.   The *Green* factors:  Faculty and staff hiring and placement; transportation; extracurricular activities; facilities and capital expenditures.

It is undisputed that the Board aggressively recruited black faculty and staff

and has achieved the CSA's goal of a 70% to 30% faculty racial composition

system-wide.[18]   Nor is it disputed that the Board provided transportation in a non-

discriminatory fashion or that it transported students to magnet programs far from

their homes at no cost to them.  The evidence also supports the district court's

---

[18]The NAACP contends only that the Board has not been in substantial compliance for at least three years as required by the CSA.  The district court specifically found that the Board had been in compliance since the 1995-96 school year and the NAACP presented no evidence to the contrary.  Therefore, this finding is not clearly erroneous.

13

finding that the Board made all extra-curricular activities available to all students throughout the county without regard to race.[19] Finally, the district court found that it is "beyond dispute" that the Board has substantially complied with all of the requirements contained in the CSA with respect to facilities improvements and repairs, spending over $60,000,000 to modify and improve existing schools, most of which were located in inner-city areas. Thus, we conclude that there is no clear error in the district court's finding that the Board has achieved unitary status with respect to five of the six *Green* factors.

B.    Student Assignment

With respect to student assignment, it is undisputed that the Board implemented a voluntary school choice plan, terminated mass busing, and designated 71 schools as magnet schools, all as the CSA required. The district court also found that the Board allocated appropriate funding for the operation and improvement of its magnet programs. It operated a separate office with staff dedicated to achieving the CSA goals, including magnet program development and recruitment. The Board has also engaged in substantial and continuing efforts to recruit white students to its racially identifiable black elementary schools, each of

---

[19]Since participation in extra-curricular activities is voluntary, the law does not require, nor does the CSA establish, racial balance goals for this *Green* factor. Eliminating racial distinctions is required, however, and the district court correctly found that the evidence is that this has been done.

14

which has a magnet program. The district conducts a "Magnet Mania" recruitment fair, distributes a catalogue to parents, maintains a telephone hotline, and directly recruits parents to encourage magnet enrollment of their children.

Furthermore, while not contractually obligated to, the Board did use several other methods to increase racial balance at certain schools, including capping enrollment,[20] majority to minority transfer programs,[21] attendance boundaries[22] and limits on curriculum offerings at certain schools.[23]

The evidence at trial was that the Board's efforts have substantially achieved

---

[20]The Board did cap white enrollment at three schools, one of which was identifiably white. Those students who were "capped out" were encouraged to attend magnet programs at one of the preferred option schools. The Board provided free transportation to those students who did so.

[21]The Board has used a majority to minority transfer program to assist in desegregating naturally integrated, identifiably black, and identifiably white schools. Free transportation has been provided to transferring students. The evidence was that requests for transfers within the elementary system are denied if they are counterproductive to the Board's desegregative efforts. In 1996, the Board mailed transfer letters to more than 36,000 parents, resulting in only 332 transfer requests. The Board contends that these low numbers demonstrate that students attending racially identifiable schools are doing do because it is their parents' preference.

[22]The Board changed the attendance boundaries for one high school in order to increase black enrollment and that school has been in compliance with the CSA goals since that time. No changes were made in the attendance boundaries of the racially identifiable elementary schools, however, because the evidence was that such changes would have made little difference in the racial composition of these schools since most of them are in the overwhelmingly black core city.

[23]The Board did not, however, limit the curricular offerings at any of the racially identifiable elementary schools because it believed it necessary to provide each student at every elementary school with a complete curriculum. In the Board's view, limiting the curriculum at an elementary school, even in order to foster movement of students out of racially identifiable schools, was not consistent with the goals of the CSA or sound educational policy. Instead, the Board sought to encourage student movement by enhancing the curricular offerings at various racially identifiable schools through the magnet programs.

the CSA's student enrollment goals. In 1991-92, the first year under the CSA, 65 of the 139 elementary, middle and high schools met its goal of a student population that was more than 20% but less than 55% black. By the 1996-97 school year (the year application was made for unitary status), 88 of 138 schools, or 64% of the district's schools, were in compliance with the CSA's student enrollment goals. One year later, in 1997-98, the number of schools in compliance rose again, to 91 out of 140, or 65%.

At the elementary school level, the compliance rate went from 42% (42 of 100) at the inception of the CSA (1991-92 school year), to 60% (60 of 100) in 1997-98. Middle schools went from 59% compliance in 1991-92 (13 of 22), to 77% compliance in 1997-98 (17 of 22). High schools were 59% compliant in 1991-92 (10 of 17) and 76% (13 of 17) compliant in 1997-98.[24]

Despite this overall substantial compliance with the CSA's enrollment goals, there are 26 identifiably black schools in Duval County. The following table illustrates this fact.

---

[24]Highly successful academic magnet programs have succeeded in transforming three of the racially identifiable middle schools and two of the racially identifiable high schools into schools with diverse student bodies. Two middle and two high schools in the core city, however, remain identifiably black. The magnet programs at these schools have been modified in a continuing effort to recruit minority students.

16

| School Year | Total Student Population | Black Students | White Students | Total Schools | Schools Exceeding 75% Black Students |
|---|---|---|---|---|---|
| 1969-70 | 121,667 | 28% | 72% | 135 | 29 (21%) |
| 1990-91 | 111,146 | 37% | 63% | 139 | 21 (15%) |
| 1996-97 | 125,971 | 40% | 60% | 141 | 30 (21%) |
| 1998-99 | 122,743 | 41% | 59% | 144 | 26 (18%) |

Two things are clear from this table. First, the *Mims* injunction was successful in eliminating the vestiges of *de jure* discrimination. Under its mandatory student assignment orders, all students were assigned to schools based upon racial balance goals and then large numbers were bussed to achieve those goals. During this time, the number of racially identifiable schools in the system was significantly reduced. As the table shows, from 1971 to 1991, the number of schools with 75% or more black students went from 21% to 15%.

As we observed earlier, the evidence at trial was that all the racially identifiable Attachment C elementary schools in the core city were attended by students of both races during those years. All but two of the fifteen schools formerly operated solely for black students reached what later became the CSA racial balance goals for at least a three-year period before the implementation of

17

the CSA.[25]  The Board had broken the pattern of all-black enrollment at the schools

it formerly operated solely for black students during *de jure* segregation, and had

successfully eliminated the vestiges of *de jure* segregation in all the Attachment C

schools.[26]

---

[25]These were the elementary schools identified in the *Mims* injunction as the "vestiges of *de jure* segregation." The dissent incorrectly implies that these schools "remained" racially identifiable throughout the entire period of federal court supervision. The dissent also incorrectly maintains that the neighborhoods in which these schools are located are now, and have always been, over 90% black, when the record evidence is that these neighborhoods once supported 13 all-white elementary schools and only became over 90% black with the white flight that was precipitated by mass bussing.

[26]In the final analysis, the dissent gives no weight at all to the "root and branch" destruction of *de jure* segregation which occurred with the massive bussing under the *Mims* injunction, not because it didn't occur soon enough, but because it occurred *too soon* to count! In rejecting all pre-CSA events as irrelevant to the issue of unitary status, the dissent ignores the first thirty years of federal supervision of the Duval County school system. During these years, the Board ended *de jure* segregation and instituted mass bussing to eliminate the vestiges of that *de jure* segregation. Then, having broken the link to the past, the Board began the final phase of its decades-long desegregative effort by entering into the CSA, a contract which expressly recognized the demographic shifts in the student population and which established an aggressive magnet program, as well as other steps, designed to ameliorate the resulting racial imbalances. The Board's efforts under the CSA have resulted in a 65% compliance rate with its racial enrollment goals. Ignoring this context, and pretending that the Board's success in eliminating the vestiges of *de jure* segregation does not count if it occurred before 1991, is the only premise upon which the dissent can build a case that "the Board did not eliminate the vestiges of segregation at its formerly de jure black schools during the CSA enforcement term." (This may be the first time that a school district has been judicially chastised for achieving too much, too soon!)
But this is not the law. The Supreme Court has made clear that, once the vestiges of *de jure* segregation have been eliminated, as they were in Duval County under the *Mims* injunction, any re-emergence of racially identifiable schools resulting from demographic changes (over which the Board, of course, has no control) *cannot* be attributed to the Board's former *de jure* segregative policies. *Freeman*, 503 U.S. at 494. Nor does the Board have any constitutional obligation to combat these factors. *Id.* On the issue of whether the Board has met its contractual obligation to ameliorate the impact of these demographic shifts, the district court's catalogue of findings of fact attesting to the Board's good faith and often extraordinary efforts in achieving a 65% compliance rate with the CSA's racial enrollment goals overwhelmingly support our conclusion that it has.

Then, immediately upon the establishment of the CSA's local attendance

zones, the number of racially identifiable schools, as the parties had expected,

rebounded to 21%.[27]  Although the percentage of racially identifiable schools has

now declined to 18%, the Board acknowledges that under the CSA, the school

district has experienced an increase in the total number of racially identifiable

schools.  It denies, however, that this is the result of any resegregative policies,

either intended or unintended.

The Board points out that 19 of the 26 racially identifiable schools in

operation today[28] are the Attachment C elementary schools located in the core

city.[29]  Testimony presented at trial persuasively demonstrated that their racial

identity has been substantially caused by the decline in the number of white

students in these schools.[30]

The table graphically illustrates this decline.  With the advent in 1971 of

mass bussing, substantial numbers of white students began to leave the public

---

[27]It should be noted, however, that the overwhelming majority of the schools in the system remained in a desegregated status.

[28]The most recent data is for the 1997-98 school year.

[29]With respect to all elementary schools, however, there has been a decline in racially identifiable schools.  In the 1991-92 school year, 25 elementary schools had a black population in excess of 75%.  By the 1997-98 school year, only these19 were left.

[30]The NAACP has not disputed the district court's findings of fact concerning the "white flight" that preceded the CSA, nor the statistical data underlying them.

school system. In 1969, the Duval County public school student population was 72% white. By 1998, only 59% of that population was white.[31] As a result, the percentage of black students went from 28% to 40%. The Board's racial enrollment statistics demonstrate that much of the decline in the white student population occurred in the schools of the core city, ultimately leaving it with a school-age population that is over 96% black. A former school district superintendent testified that even the 13 formerly *de jure* all-white elementary schools in the core city became identifiably black schools with the end of mass bussing. Additionally, the *de jure* white high school in the core city also became identifiably black.[32]

Furthermore, the Board presented evidence that during this same period of time black student mobility has sometimes caused formerly racially balanced schools to become racially identifiable black schools.[33] For example, the

---

[31]Actually, the table exaggerates the white student population because it puts all non-black students into the "white" category, including Asians, Hispanics, and Native Americans. The student population characterized as "white" by the school board was down to 54% in 1997.

[32]Under the *Mims* injunction, the *de jure* black high school in the core city was paired with its all-white counterpart, which was located virtually across the street. The district court revised the attendance zones for each, expecting to produce two totally integrated high schools with a white population of approximately 40% each. Within two years, however, both high schools were overwhelmingly black (90%+). They remain so today.

[33]Dr. Milan Mueller conducted a seven-year study of black student mobility in Duval county. His study was designed to reveal the impact of such mobility on racial balance in school enrollments.

residential areas surrounding two naturally integrated elementary schools[34] experienced an increase in black students from approximately 20-30% in the 1989-90 school year to approximately 40-60% in 1996-97. The residential areas surrounding two additional elementary schools went from 20-30% in the 1989-90 school year to 30-40% in the 1996-97 school year. These dramatic increases in the number of black school-age children residing in the areas surrounding these naturally integrated schools persuaded the district court that "the loss of these naturally integrated schools was the result of housing demographics, and not any intentional or unintentional policy operated by the Board."

Finally, the Board's expert demographer's evidence was that even though the black student population is declining in the core city (6% decline), as black families move to the outlying areas of the city (26% gain in the areas surrounding the inner city, and 41% gain in the outermost areas), more black than white students move into the core city, from both outside and outlying areas of the county.

The district court concluded that:

> In response to the School Board's direct evidence and expert testimony attributing present racial imbalances in some schools to

---

[34]The parties agreed in the CSA that certain of the schools in the district were "naturally integrated" prior to implementation of the CSA due to residential patterns.

demographic factors beyond the Board's control, the NAACP has failed to present any persuasive evidence that such racial imbalance existing at any elementary, middle, and senior high school is the result of anything other than racial isolation in housing patterns and the continued existence of "white flight" in Duval County. The Board has simply not contributed to or perpetuated the current imbalance in any way. To the contrary, the Board has made enormous efforts to counter the effects of past discrimination and present-day choices by parents.

Since the NAACP was unable to demonstrate that the continued existence of identifiably black schools in Duval County is a vestige of prior *de jure* segregation rather than the result of these demographic or other non-discriminatory factors, the district court held that the county was entitled to unitary status on this *Green* factor as well.

We agree. As we have noted above, in such cases a school district is under no duty to remedy racial imbalances that are caused by demographic factors. *Freeman*, 503 U.S. at 494. As the Supreme Court wrote in *Swann*:

> Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system. This does not mean that federal courts are without power to deal with future problems; but in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary.

402 U.S. at 31-32.

In *Freeman*, the Supreme Court added:

> The effect of changing residential patterns on the racial composition of schools, though not always fortunate, is somewhat predictable. Studies show a high correlation between residential segregation and school segregation. . . . Where desegregation is a product not of state action but of private choices, it does not have constitutional implications. It is beyond the authority and beyond the practical ability of the federal courts to try to counteract these kinds of continuous and massive demographic shifts. To attempt such results would require ongoing and never-ending supervision by the court of school districts simply because they were once *de jure* segregated. Residential housing choices, and their attendant effects on the racial composition of schools, present an ever-changing pattern, one difficult to address through judicial remedies.

503 U.S. at 495.

We believe the district court correctly concluded that this is such a case. Although the Duval County school district as a whole is undeniably in substantial compliance with the goals of the CSA, white flight and voluntary residential patterns have re-segregated a number of the core city's schools.[35] There is no evidence that any Board policy contributed to the re-emergence of these schools or perpetuated their existence in any way. "While those charged with desegregation must not shrink from the threat of white flight, school officials who have taken effective action have no affirmative fourteenth-amendment duty to respond to

---

[35]Current demographic trends indicate that the school system may become even more racially balanced as the black student population continues to shift out of the core city. In the interim, the success of the Board's magnet school program can be expected to further reduce the number of racially identifiable schools.

23

those who vote with their feet." *Ross v. Houston Indep. Sch. Dist.*, 699 F.2d 218, 225 (5th Cir. 1983).

Nor does the existence of racially identifiable schools in Duval County necessarily trump the Board's claim to be operating a unitary system. *Pasadena*, 427 U.S. at 424; *Freeman*, 503 U.S. at 493-94; *Jenkins*, 515 U.S. at 116 (Thomas, J., concurring). *Id.* In *Freeman*, for example, the Supreme Court affirmed a finding of unitary status in a school district in which 50% of the black students attended schools that were over 90% black in a system where blacks comprised only 47% of the student body. Furthermore, 5 of the 22 high schools were over 90% black, and another 5 were over 80% white. Finally, 18 of the 74 elementary schools were over 90% black and 10 were over 90% white. 503 U.S. at 476-77. In rejecting the argument that such racial imbalances precluded a finding of unitary status, the Court held that "the school district is under no duty to remedy imbalance that is caused by demographic factors." 503 U.S. at 494.

We, too, have had occasion to consider the impact of racially identifiable schools on a school district's request for unitary status. In *Manning*, the district court denied unitary status to the Hillsborough County school system in which approximately 90% of the system's schools were racially balanced, but which also had 17 racially identifiable schools. In reversing the district court, we held that the

24

existence of these racially identifiable schools did not preclude a finding of unitary status since the county proved that external forces were a substantial cause of the racial imbalances. 244 F.3d at 944.

Other courts have also ended federal supervision despite the existence of racially identifiable schools in a district. The First Circuit Court of Appeals upheld a finding of unitary status in a school district where 8 schools enrolled a student body that exceeded 80% black, and 5 schools enrolled a student body that was in excess of 80% white. *Morgan v. Nucci*, 831 F.2d 313, 320-22 (1st Cir. 1987). The court held that "maximum practicable desegregation" is a "practical, not theoretical standard," and "[u]nitary status is not simply a mathematical construction." *Id.* at 321. Instead of focusing on racial quotas, the court looked to the school district's history of good faith in both the operation of the school system and the implementation of the court's student assignment orders. *Id.* Similarly, the Fifth Circuit affirmed unitary status for a district in which 55 out of 226 schools had student populations that were 90% or more black, in a district that was 20% white, 38% black, and 42% hispanic. *Ross*, 699 F.2d at 228.

Several district courts have also declared school districts unitary despite the continued operation of numerous racially identifiable schools. *See e.g., United States v. Unified Sch. Dist. No. 500*, 974 F. Supp. 1367 (D. Kan. 1997); *Stell v. Bd.*

25

*of Pub. Educ.*, 860 F. Supp. 1563, 1580 (S.D. Ga. 1994); *Flax v. Potts*, 725 F.

Supp. 322, 328-29 (N.D. Tex. 1989), *aff'd and remanded on other grounds,* 915

F.2d 155 (5th Cir. 1990).

Even an *increase* in the number of racially identifiable schools during the

period of federal court supervision does not preclude a finding of unitary status.  In

*Manning*, we affirmed unitary status even though *every one* of the 17 racially

unbalanced schools in Hillsborough County had become so during the pendency of

the district court's supervision.  *Id.*  In *Ross*, the Fifth Circuit affirmed unitary

status despite the fact that the number of racially identifiable schools in Houston

had increased by 33 during the district court's supervision.  699 F.2d at 227-28.

"Constructing a unitary system," the court said, "does not require a racial balance

in all of the schools.  What is required is that every reasonable effort be made to

eradicate segregation and its insidious residue."  *Id.*[36]

The NAACP, however, insists that, unlike these other school districts, Duval

County is not entitled to unitary status until it eradicates its racially identifiable

schools.  It argues that under the CSA, the Board is obligated to achieve the

"maximum practical desegregation."  So long as the district contains racially

---

[36]Indeed, as Justice Powell once noted, to expect a total absence of one-race schools would deny the demographic and economic realities of most major cities.  *See Estes v. Metropolitan Branches of the Dallas NAACP*, 444 U.S. 437, 445-46 (1980) (Powell, J., dissenting from dismissal of writ of certiorari as improvidently granted).

identifiable schools, it concludes, the Board is not in substantial compliance with its contractual duty.

The Supreme Court has made quite clear, however, that the Constitution does not require a school board to eliminate the vestiges of past discrimination "to the maximum extent practicable." *Jenkins*, 515 U.S. at 90; *Freeman*, 503 U.S. at 492; *Dowell*, 498 U.S. at 250; *Manning*, 244 F.3d at 942. The Court expressly rejected this test in *Jenkins*, and held that the proper test was whether the deficiencies "attributable to prior *de jure* segregation had been remedied *to the extent practicable*." 515 U.S. at 101 (emphasis added). *See also Manning*, 244 F.3d at 943 n. 28.

Under the correct constitutional standard, then, Duval County is entitled to unitary status if it has eliminated the vestiges of *de jure* segregation to the extent practicable. It is not responsible for the segregative effects of external forces over which it has no control. *Freeman*, 503 U.S. at 494. Since the Board has demonstrated that white flight and voluntary residential isolation, and not its policies, substantially caused the racial identifiability of some of its schools, they are not the vestiges of *de jure* segregation and the Board is under no constitutional obligation to combat the demographic factors which produced them. *Id.*

What then do we make of the CSA's requirement that the Board "take steps

to the maximum extent practicable" to achieve its racial enrollment goals? Interpreting the contract in its constitutional context, the CSA requires the Board to implement policies that will desegregate Duval County's schools to the maximum extent practicable within the parameters of the county's particular characteristics. The district court correctly found that, within this context, the Board has performed its obligations to the maximum extent practicable.

C.      The Board's Good Faith Performance Under the CSA

The NAACP's final claim on appeal[37] is that the Board has not implemented the CSA in good faith. The Board has both a contractual and a constitutional obligation to do so. *Dowell*, 498 U.S. at 249-50. To be entitled to unitary status, not only must a school system eliminate the vestiges of *de jure* segregation to the extent practicable, but "local authorities [must] have in good faith fully and satisfactorily complied with, and shown a commitment to, the desegregation plan." *Id. See also Manning*, 244 F.3d at 942. Failure to do so can justify continued judicial supervision of a desegregation decree. *Id.*

The CSA was designed to achieve the maximum practicable desegregation within a system of voluntary choice, which would be guided and molded by the existence of attractive magnet programs at formerly racially identifiable schools.

---

[37]We find no merit in any contention raised by the NAACP which we do not discuss.

28

The district court found that the Board not only timely implemented its centerpiece – the magnet program – but that it generously funded and aggressively marketed it. The court also found that the Board has not only taken the other steps required of it by the CSA's 33 paragraphs, but that it has done so in a timely and inclusive manner. All the evidence indicates that the Board has consulted extensively with the NAACP in implementing the magnet programs, deciding on new student assignments and building new schools.

During this time, the Board has never been found to be in violation of any provision of the CSA. The district court concluded that the Board has exhibited enormous good faith in performing its agreement to craft a school system which protects student and parent choice while vigorously encouraging a race neutral distribution of students throughout the system.

As with the Board's compliance with the CSA, however, the NAACP views the good-faith glass as half-empty. It contends that the Board has failed to utilize "standard school desegregation techniques mentioned in the CSA" to eliminate its racially identifiable schools.[38] Like the claim that the district is not in substantial

---

[38]The CSA stated that the Board "may adopt other techniques to achieve desegregation in its schools, including, but not limited to: capping the enrollment; re-designing the student attendance zones; and limiting the curricular offering at certain magnet programs." Although not mandatory, the Board has employed some of these techniques at some schools as discussed above.

compliance with the CSA, however, this argument is tainted by the NAACP's adoption of the wrong legal standard. *See Manning*, 244 F.3d at 943-44. The Constitution does not require a school board to remedy racial imbalances caused by external factors, such as demographic shifts, which are not the result of segregation and are beyond the board's control. *Freeman*, 503 U.S. at 495. Therefore, the Board is not obligated to employ a particular desegregative method because it might remedy these racial imbalances.[39] *Id.* at 490.

The Board's constitutional obligation is only to eliminate the effects of a constitutional violation. The continued existence of a some racially identifiable schools within the district is not, by itself, proof of a constitutional violation, nor has the NAACP offered any. Without proof that the Board's present or former segregative policies or practices are the cause of current racial imbalances, it is under no constitutional duty to employ desegregative techniques not required by the CSA to combat the demographic factors that are. Furthermore, we are without

---

[39]The NAACP contends, and the dissent implies, that the Board should have implemented a "controlled choice" plan to achieve "maximum" racial balance in the district's schools. Under such a plan, groups of schools are clustered and each student is provided with a form with which to rank preferences for attendance within the cluster, including at least one school with a student body predominantly of the other race. When racial enrollment limits are reached at one school, the remaining students of that race are assigned and bussed to a school based on the racial composition of the school. The purpose of such a plan is the *maximum* possible desegregation of a school district without regard to the causes of the offending racial imbalances. This the Constitution does not require. Furthermore, the NAACP concedes that implementation of such a plan in Duval County would require a return to *substantial* bussing of students to achieve the desired racial mix. This the CSA not only does not require, but, in fact, was specifically implemented to avoid.

power to order it to do so. *Milliken v. Bradley*, 433 U.S. 267, 282 (1977) ("[F]ederal-court decrees must directly address and relate to the constitutional violation itself . . . [and] exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution.").

Nor do we find any merit in the NAACP's contention that the Board has "acted and omitted in classically segregative manners." The crux of this complaint is that the Board should have built new schools in the so-called "grey areas" between the black core city and the white outlying suburbs. This desegregative technique, it is argued, would have helped to achieve the maximum desegregation possible in the district.

The evidence at trial was that the Board and the NAACP met on several occasions to discuss proposed sites for new schools. The former superintendent of the school system even proposed the use of the "grey area" sites for some new construction. After study, however, it was determined that each of the proposed grey sites had serious geographical deficiencies. Many were in highly commercialized areas, and several had serious pollution issues. Ultimately, none of these sites was deemed suitable for new school construction.

The Board then created a Desegregation Committee in 1995 to consider and recommend new school sites, but the NAACP refused to participate. The

31

committee recommended the construction of 10 new schools. These recommendations were incorporated into a five-year facilities plan that was distributed to the NAACP later that year. The evidence was uncontradicted that all but one of these schools were built in areas for which the Board projects strong or moderate growth in student enrollment, including black students.[40] The Board's expert testified that black student mobility to these areas of naturally integrated housing patterns will eventually increase the desegregation of the district's schools.[41]

In view of the foregoing, we conclude that the NAACP's mistaken view that the CSA and the Constitution require the Board to employ the maximum desegregative techniques available has led it to conclude that the Board has acted in bad faith in its site selection for new schools. Neither the CSA nor the Constitution require the Board to build new schools in the most integrated parts of the county regardless of whether these sites correspond to the areas of maximum

---

[40]The exception was an elementary school built in the core city to replace an unsafe school.

[41]The NAACP also contends that the Board is guilty of bad faith because it has not filled empty seats in core city schools with white students in an attempt to maximize desegregation but rather has used portable classrooms to keep white students at white schools. The district court correctly found that there is no evidentiary support for either of these contentions. The evidence was that the empty seats in the core city would in no way accommodate the population growth in the outlying areas without increasing those seats by bussing black students out. The Board's facilities superintendent also testified that portable classrooms are not used at schools where student enrollment is not within the CSA goals.

population growth.  The district court correctly found that the Board has fulfilled its constitutional and contractual obligation to act in good faith in the selection of new school sites in a race-neutral way.  We agree.

IV.

In sum, we conclude that the judgment from which the appeal is taken is due to be affirmed.  An affirmance implies that appellants have lost.  In a meaningful way, however, that implication is not justified here.  This judgment means that appellants have accomplished what they, decades ago, set out to do.  They challenged a rigidly maintained, *de jure* system of school segregation and sued to bring it into compliance with the constitutional requirement of equal protection under the law.  We say today that they have succeeded.  If this judgment is counted as a loss for appellants, it is so because they have won.

Furthermore, none should read more into this judgment than it contains. With its implementation, the Duval County school system may be out of the courthouse, but it is not out of the reach of the Constitution, the Bill of Rights, and the laws of this land.  Nothing in this judgment authorizes conduct contrary to these laws.  The Board, and the people of Duval County who, in the end, govern their school system, must be aware that the door through which they leave the

courthouse is not locked behind them. They will undoubtedly find that this is so if they fail to maintain the unitary system we conclude exists today.

The judgment of the district court is **AFFIRMED.**

BARKETT, Circuit Judge, concurring in part and dissenting in part:

I agree with the district court that the Duval County School Board ("the Board") was entitled to a declaration of unitary status on the majority of the Green factors. See Green v. Sch. Bd. of New Kent County, 391 U.S. 430 (1968). However, I do not believe that the Board was entitled to a declaration of unitary status in the area of student assignment, the root of the Duval County's (the "District's") prior unconstitutional de jure segregated school system. Certainly, I too would like to say that the Board finally "got it right," and end the forty one years of judicial supervision in this case. However, until the Supreme Court simply announces that the time has come to end judicial oversight over school districts, regardless of their status, we must faithfully apply the unitary status standards when determining whether judicial supervision should be terminated. In this case, the Board was required to establish that it made a good faith effort to desegregate the black core city schools created under de jure segregation in order to merit an award of unitary status in the area of student assignment. It failed to do so and, therefore, we are required to retain judicial supervision over this area.

As the majority explains, when a school board that is subject to a desegregation order seeks to bring an end to judicial supervision over the school district it must satisfy the two unitary status requirements: first it must establish

35

that it has complied in good faith with the controlling desegregation order, and second, it must demonstrate that it has eliminated the vestiges of de jure segregation to the "extent practicable." See Bd. of Educ. of Oklahoma City Pub. Sch. v. Dowell, 498 U.S. 237, 249-50 (1991); Lockett v. Bd. of Educ. Muscogee County Sch. Dist., 111 F.3d 839, 842 (11th Cir. 1997); Lee v. Etowah County Bd. of Educ., 963 F.2d 1416, 1425 (11th Cir. 1992). In this case, the NAACP and the Board agreed that the Board's desegregation obligations would be outlined in a negotiated settlement agreement, the Corrected Stipulation and Agreement ("CSA"), instead of a court order. However, before the district court approved the agreement, it had to be satisfied that the CSA, at a bare minimum, adequately addressed the Board's constitutional obligation to desegregate the District's formerly de jure segregated schools. The district court concluded that the CSA addressed the Board's constitutional obligations in the area of student assignment by setting target racial enrollment goals for various school groups in the District. However, the parties are fundamentally at odds over how many and which schools were required to reach the CSA's student enrollment goals in order to demonstrate that the Board substantially complied with the CSA's student enrollment provisions.

The majority resolves the compliance disputes in this case in favor of the

36

Board and rules that the Board's magnet program, which achieved a 65%

compliance rate district-wide with the CSA's student enrollment goals, was

sufficient to meet the Board's obligations. It also accepts the Board's argument that

the current 96% segregation rate in the District's Attachment C former de jure black

schools is the result of a new pattern of white flight,[1] as shown by demographic

evidence revealing a 12% relative shift in the ratio of black to white students in the

District over the twenty seven years prior to the CSA's creation. I cannot agree.

I believe that the CSA was crafted to address the core constitutional injury in

this case: the high rates of racial segregation in the District's formerly de jure black

core city schools. The record shows that these schools had over 90% black

enrollments at the end of de jure segregation, and have remained 90% black during

the course of the CSA's enforcement term. Also, the record plainly shows that

these schools are not segregated as a result of a new pattern of white flight. The

---

[1] This figure was computed based on Attachment C, a CSA Appendix that identifies 28 schools that the parties recognized would have 75% black student enrollments after the District ended forced busing. As such, these schools were the primary focus of the CSA. Review of Attachment C shows that, out of the 28 schools listed, only 23 are currently open. Therefore, I exclude from my analysis the five elementary schools that were closed; namely, the Sherwood Forrest, Beal, Lackawanna, Rutherford, and Scott elementary schools. I also exclude Jacksonville Beach from these figures, as the school is located in Zone VII, and Attachment C and the CSA clearly indicate that the Attachment C student enrollment goals were only intended to apply to schools in Zones I-V. (CSA Attachment C & CSA ¶4). Out of the remaining 22 Attachment C schools, only one (Axson Elementary School) achieved the CSA student enrollment goals in 1998-99, the year the District was granted unitary status. Therefore, 96% of the Attachment C schools were not in compliance with the CSA's student enrollment goals.

Board's demographic evidence shows that the white flight it complains of preceded the creation of the CSA and, moreover, was adequately accounted for in the CSA's less stringent student enrollment goals.[2]  The white flight that did occur during the CSA's enforcement term, a 4% decrease in the number of white students district-wide, had little or no effect on the Board's ability to desegregate the core city schools, as these schools are located in black neighborhoods that have been over 90% black since the end of the de jure segregation.

Although the majority ultimately concedes the importance of the Attachment C schools, it excuses the Board's dismal performance at these schools by showing that the Board met the CSA's standards for desegregating these schools prior to the CSA's creation.  However, in a proper unitary status inquiry, the court must apply the relevant desegregation order to the period it was designed to address.  The proper inquiry in this case is whether the Board met its obligations under the CSA during the CSA enforcement period, which began after 1991.  Under this inquiry,

---

[2] The Supreme Court has indicated that it is improper for the court to alter a school board's desegregation obligations in light of demographic shifts in the district,  explaining that once the Board satisfies its original obligations, it cannot be required to continually reorganize its efforts to address the changing composition of the district.  See Freeman v. Pitts, 503 U.S.  467, 493-94 (1992) (recognizing that a school board that had temporarily achieved the desegregation decree's goals could not be required to continually change its efforts to address the *changing demographic composition of the district*); Pasedena Bd. of  Educ. v. Spangler , 427 U.S.  424, 434-35 (1976) (same).  This rule, however, does not prevent a school board from entering into a desegregation contract that creates new student enrollment goals that account for these demographic changes.

38

the record shows that the Board did not eliminate the vestiges of segregation at its formerly de jure black schools during the CSA enforcement term, and it failed to provide a plausible justification for its failure to do so.  Therefore, it was not entitled to a declaration of unitary status in the area of student assignment. Furthermore, by applying the CSA standards to assess the Board's performance prior to the period the CSA was created, the majority runs afoul of our precedent in this case, and improperly lowers the Board's compliance standard below what was required by the orders governing the pre-CSA period.

A.    **Identifying The Proper Compliance Standard For The Student Enrollment Provisions**

As the majority explains, the parties' disputes about the implementation of the CSA must be resolved under a contract analysis.  Therefore, the Court must first refer to the CSA's terms to discern the Board's desegregation obligations. Jacksonville Branch, NAACP v.  Duval County Sch. Bd., 978 F.2d 1574, 1578 (11th Cir. 1992) ("NAACP II") (citing United States v.  Armour & Co., 402 U.S. 673 (1971)).  As with all contract disputes, the obligations of the CSA must be discerned "within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it."  NAACP II, 978 F.2d at 1578.  Also, the Court's interpretation must give full effect to both the individual obligations

39

outlined in the agreement, and their collective or overall purpose.  See Restatement (Second) of Contracts § 203 (a) (explaining that in interpreting "a promise or agreement or a term thereof . . . an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.").  However, when the CSA is silent or ambiguous as to the meaning of a particular term, its meaning must be interpreted based on the constitutional standards that inform all desegregation cases, because the CSA would have been invalid had it allowed the Board to escape its desegregation obligations under the Constitution.

### 1.  *The Compliance Standard Suggested By The CSA's Terms*

As explained above, the CSA's student assignment provisions do not explicitly indicate how to measure compliance under the agreement, apart from providing general guidelines on the enrollment goals for particular school groups. Consequently, the Board argues that we should measure its compliance with the CSA's student assignment provisions by examining its performance district-wide, that is, with regard to all of the schools in the District.   Using this measure, the Board argues that it is entitled to a finding that it "complied in good faith" with the CSA because it achieved a 65% success rate district-wide with the CSA's student

40

enrollment goals.[3] The NAACP argues that the CSA requires the Board's compliance to be assessed based on its ability to desegregate the Attachment C schools – a subset of 28 schools specially highlighted in the CSA as schools that were "expected to become" racially identifiable black schools at the end of the Mims Injunction forced busing program. (CSA, Attachment C).[4] Using this measure, the Board's performance under the CSA was a dismal failure because, in 1998, when the district court granted unitary status in this case, 96% of the Attachment C schools were not in compliance with the CSA's student enrollment goals.[5]

---

[3] The majority parses this same data several ways, to show that the Board achieved different rates of success as measured between elementary schools, middle schools, and high schools. The distinction between elementary, middle, and high schools however, is not relevant to our assessment. Rather, the focus must be on whether the Board remedied the original constitutional violation in this case— that is, whether it desegregated the former de jure black schools.

[4] Although the parties describe the Attachment C schools as schools that were "expected to become" racially identifiable black schools , this designation is in some ways a misnomer. Many of the schools in Attachment C were actually the former de jure black schools in existence at the start of desegregation, which remained identifiably black during Mims Injunction period and were still identifiably black when the CSA was negotiated, as they had not reached their student enrollment goals. The Attachment C group, however, also contains some schools that were expected to become racially identifiably black at the end of Mims because they were located in or near black neighborhoods created during the era of the de jure racially segregated school system. (Dist. Ct. Op. at 13). The Board was permitted to account for these problems as a contractual matter. Also, it was required to take account of this problem in fulfilling its constitutional obligations. See Freeman, 503 U.S. at 514 (Blackmun, concurring).

[5] There is some authority that suggests that a school board may deviate from a desegregation order's student enrollment goals by as much as 15-20% and still be considered in compliance. See Belk v. Charlotte-Mecklenburg Bd. of Educ., 269 F.3d 305 (4th Cir. February 7, 2001 ) (citing Manning v. School Bd. of Hillsborough County, 244 F.3d 927, 935 (11th Cir. 2001). I offer no opinion on whether this would be a fair standard for assessing compliance under a desegregation

41

In my view, the CSA clearly indicates that the parties' primary focus was on the Attachment C schools, and any measure of the Board's success must therefore prioritize this school group. Indeed, the majority concedes this point, as it recognizes that the CSA's main goal was to desegregate the Attachment C schools. (Maj. Op. at 6). See also Dist. Ct. Op. at 11 (recognizing same). This conclusion is evidenced by the fact that the vast majority of the CSA's student assignment provisions are devoted to this purpose. Specifically, the CSA divided the District into school groups that were rated based on their need for further desegregation efforts. CSA ¶¶ 3, 5-14.[6] The CSA then identified three sets of elementary schools: "Attachment B" or "stand alone schools," which were racially integrated elementary schools that were not in need of immediate assistance, CSA ¶ 6; "Attachment C" or "racially identifiable black schools;" and "Attachment D," or "racially identifiable white schools," both of which were in need of immediate desegregation assistance. CSA ¶ 7. The Attachment C and D schools had, or were expected to develop, racially imbalanced enrollments, which the CSA defined for Attachment C schools as a student body composed of 75% or more black students, and defined for

agreement, like the one at issue here. However, even under this more permissive measure, the Board's enrollment statistics show that more than half of the Attachment C schools deviated more than 20% from the CSA's student enrollment goals, and 85% of the Attachment C schools named in the Mims Injunction deviated more than 20% from the CSA's goals.

[6]Middle and high schools were treated separately, and were not the main focus of the agreement. (Dist. Ct. Op. at 4 ).

Attachment D schools as a student enrollment of 85% or more white students. (CSA, Attachments C & D) (Dist. Ct. Op. at 11). The CSA expressly established as its primary goal that the Board would enroll 20% - 55% black students at the Attachment C & D schools, and would maintain this enrollment over a three-year period. CSA ¶¶ 4 & 31.[7]

Even between the Attachment C and the Attachment D schools, the parties appeared to recognize that the predominately white schools in Attachment D would have less difficulty meeting the CSA standards, i.e., less difficulty drawing black students,[8] because there are only two CSA provisions specifically directed to the Attachment D schools, ¶¶ 18 & 19, and the more detailed of these two provisions is designed to ensure that the Attachment D schools would not continue to draw white students away from the Attachment C schools. ¶ 19 (a)-(c). In contrast, the CSA contemplates greater difficulty in meeting the student enrollment goals at the Attachment C schools, as the agreement contains numerous and detailed planning provisions designed to attract white students to the Attachment C schools. See, e.g.,

---

[7] The CSA was created and negotiated between 1989 and 1990 and, because of the need for minor technical corrections, was reissued in 1991. I use 1991 as the start date of the CSA enforcement period for the purposes of clarity.

[8] Dr. Larry L. Zenke, the Board's desegregation advisor and the former superintendent of the District, testified that, when the CSA was created, the Board recognized that black students would willingly transfer into white schools, even when there were no magnet programs at the white schools, and even when there were no additional resources available at the white schools. (Vol. 10 Tr. at 87-88).

43

CSA ¶¶ 11-12, (establishing a time line for magnet program proposals for Attachment C schools, and identifying recruitment and funding efforts for Attachment C schools); ¶¶ 15-17 (discussing the role facilities renovation and replacement would play in diversifying the enrollment at the Attachment C schools).

Since the bulk of the CSA's desegregation efforts focus on the Attachment C schools, the schools in the greatest need, it would ignore the CSA's purpose to measure the Board's compliance with the CSA based on district-wide figures. To do so would credit the Board for success in desegregating the "stand alone" Attachment B schools, which as of 1990 did not require help, and "majority white" Attachment D schools, which the Board anticipated would have less difficulty meeting the CSA standards.

## 2. The Compliance Standard Required By the Board's Constitutional Obligations

Even if the CSA could be interpreted to assess the Board's compliance with the student enrollment goals based on the Board's district-wide performance, the constitutional injury in this case still requires that we focus on the Attachment C schools. A review of the first comprehensive remedial order entered in this case

shows that the court stressed the importance of desegregating the eighteen "core city" historically black schools, the majority of which became Attachment C schools under the CSA.[9]  Mims v. Duval County Sch. Bd., 329 F. Supp. 123 (M.D. Fla. 1971).  The Mims Court explained, "[n]o one argues that the 18 black core city schools are anything but the vestiges of a de jure segregated dual school system. Under the circumstances . . . [Swann v.] Charlotte-Mecklenberg [402 U.S. 1 (1971)] literally commands the integration of these core-city students with the outlying white students through busing." Mims, 329 F. Supp. at 130.  The Board now asks us to rule in a manner that functionally negates the importance of these core city formerly de jure black schools.  However, as we explained in 1971, these schools are at the heart of the constitutional violation in this case, and we cannot simply ignore them.  Therefore, without some meaningful showing of success with respect to the core city schools, the Board cannot satisfy its constitutional obligations.

B.     Identifying the Proper CSA Enforcement Period

1. *The Enforcement Period Required By The CSA's Terms*

Two things are clear from the record in this case: (1) the Attachment C

---

[9] Again, the number of elementary schools in Attachment C is higher than the number in the Mims Injunction because the parties agreed that the Board was required to remedy segregation in those schools expected to become identifiably black at the end of mass busing. These schools were "expected to become" majority black because they were either located in or near black neighborhoods that developed as a consequence of de jure segregation.

schools were the focus of the CSA and are a central part of the constitutional violation recognized in this case, and (2) during the CSA enforcement period (1991-1998) the Board failed to desegregate the Attachment C schools. To negate these facts, the Board claims that it satisfied the CSA's enrollment goals for the Attachment C schools in the years *prior to the CSA's* creation. Specifically, the Board cites enrollment statistics from 1971 to 1990, during the Mims Injunction's forced busing program, and argues that the Attachment C schools were desegregated during this period.[10] In support of this claim, it notes that the number of black majority schools fell from 21% to 15% during the period covered by the Mims Injunction. The majority concludes that this evidence is sufficient to show that the Board eliminated the "vestiges of de jure segregation" in the Attachment C schools for a reasonable period, and therefore met its burden. (Maj. Op. at 17-18).

I have found no case, and not suprisingly the Board points to none, in which a court assessed a party's compliance with an agreement based on a party's

---

[10]The majority concludes that the Board successfully desegregated the core city schools because substantial numbers of black students attended the Attachment C schools at what *later became the CSA's goals*. (Maj. Op. at 18). Specifically, the majority states:

> All but two of the fifteen schools formerly operated solely for Black students **reached what later became the CSA racial balance goals** for at least a three-year period **before the implementation of the CSA.** The Board had broken the pattern of all-Black enrollment at the schools it formerly operated solely for Black students during *de jure* segregation, and had eliminated the vestiges of *de jure* segregation in all the Attachment C schools.

(emphasis added). As explained above, the Mims standards govern the period prior to 1991 and, thus, the CSA is the wrong standard to apply to this time period.

46

behavior *prior to* the agreement's creation.  Also, in this case, the plain terms of the CSA show that there is no defensible basis for taking the CSA's terms and interpreting them to cover a period prior to the time the agreement was formed.  The agreement clearly states that it was intended to govern the period after 1991.  See CSA ¶ 4 ("[T]he parties agree that, commencing with the 1991-1992 school year, each school [in Zones I - V] shall have as its desegregative goal the enrollment of at least 20% black students and 45% white students.").

Furthermore, I find this interpretive maneuver illogical.  The majority implicitly concludes that the parties entered into an agreement in 1991 to achieve goals that they had already reached prior to that period.  But why would they do that?  The only fair reading of the CSA's terms is to treat the agreement as a guide for the Board's desegregation efforts and goals subsequent to 1991, as a substitute for the Mims Injunction forced busing program.  Therefore, the Board's performance prior to this period is not relevant to this dispute under a contract inquiry.

## 2.	The Enforcement Period Required Under The Constitutional Framework

In addition to running afoul of the CSA's plain terms, the majority's

application of the CSA standards to the period between 1971-1990 ignores the earlier precedent in this case. All of the earlier decisions covering this time period establish that the Board's desegregation obligations after 1971 were governed by the Mims Injunction standards, up and until that agreement was superceded in 1991 by the CSA. Mims, 329 F. Supp. 123; NAACP I, 883 F.2d 954. This decision effectively overrules the standards the Mims Court established to assess the Board's desegregation efforts between 1971 and 1991 and, more importantly, *sub silentio* reduces the Board's obligations during this period. Specifically, the majority asserts the that Board met its desegregation obligations between 1971 and 1990 by measuring the Board's performance at the Attachment C schools relative to the 20-55% black student enrollment goal provided for in the CSA, CSA ¶ 6, instead of using the 21%-34% goal for elementary schools established for this time period under Mims. Mims, 329 F. Supp. at 130.[11] The effect of the majority's analysis is to lessen the Board's desegregation obligations between 1971 and 1990 in an attempt to show that the Board satisfied its constitutional obligations during this period. However, we have already held that the Board did not meet the Mims

---

[11] The Mims Injunction also set goals for the formerly de jure black middle schools and high schools. However, because Attachment C only covers elementary schools, these figures are not relevant to our analysis.

Injunction enrollment goals prior to 1986[12] and we denied the Board unitary status on this basis.  Jacksonville Branch, NAACP v.  Duval County Sch. Bd., 883 F.2d 945, 953 (11th Cir. 1989)("NAACP I").  More important to this case, the Board did not meet the Mims enrollment goals (21-34%) under the remaining portion of the Mims enforcement period (1986-1991), and it failed to meet the CSA enrollment goals (20-55%) once the CSA became the governing enforcement standard (1991-1998).  These facts are made clear in the chart below.[13]

| BLACK STUDENT ENROLLMENT AT THE CORE CITY/ATTACHMENT C SCHOOLS | | | |
| --- | --- | --- | --- |
| | MIMS INJUNCTION PERIOD 1990-1991 | THE CSA PERIOD 1996 | CSA PERIOD CTD 1998 [UNITARY STATUS GRANTED] |
| Black Student Enrollment Goal | GOAL: 21-34% | GOAL: 20-55% | GOAL:  20-55% |

---

[12] As noted above, the majority argues that the Board met the CSA goals for the Attachment C schools for the requisite three year period prior to 1991.  However, in NAACP I, this Court clearly indicated that Board's performance prior to 1986 was insufficient to satisfy its burden under the proper measure, the Mims standard.   In regard to the Board's performance after 1986, my review of the Board's student enrollment statistics shows that the Board's performance remained static, and that the number of racially identifiable schools did not substantially change from 1986, the date it was denied unitary status in NAACP I.  See Def. Exh. 96.

[13] This graph only covers the schools that are the "core city" schools identified in the Mims Injunction, and were included in the subset of Attachment C schools that the Board was required to desegregate during the CSA time period.  Stated alternatively, the chart only shows those schools that were originally recognized as the source of the constitutional injury in this case, and were specifically designated as subject to the CSA's student enrollment goals.  As shown above, none of the Attachment C schools that were previously identified in the Mims Injunction met the CSA's student enrollment goals.

49

| Actual Black Enrollment Figures | | | |
|---|---|---|---|
| 1. Mary M. Bethune | 64% | 100% | 99% |
| 2. R.L. Brown | 66% | 64% | 96% |
| 3. George Washington Carver | 58% | 100% | 99% |
| 4. R.V. Daniels | 56% | 94% | 61% |
| 5. John E. Ford | 83% | 81% | 73% |
| 6. S.A. Hull | 90% | 94% | 91% |
| 7. S.P. Livingston | 44% | 97% | 94% |
| 8. St. Claire Evans/Moncrief | 72% | 98% | 99% |
| 9. Rufus Payne | 47% | 93% | 94% |
| 10. Pine Forest | 21% | 65% | 59% |
| 11. West Jacksonville | 71% | 98% | 96% |
| 12. Carter Woodson | 46% | 98% | 97% |
| 13. Susie Tolbert | 40% | 84% | 69% |
| 14. Longbranch | 62% | 97% | 95% |

In summary, there is no basis for rejecting the Mims Court's standards and conclusions and, therefore, no basis for revisiting and reinterpreting the Board's performance during the Mims Injunction period under the CSA standard. The only relevant inquiry in this case is whether the Board successfully desegregated the core city black schools in compliance with the CSA's student enrollment goals, which required that it maintain a black student enrollment between 20% and 55%, at the Attachment C schools during the CSA enforcement period (from 1991 to 1998). The Board failed to do so, and therefore, it has not met its constitutional obligations in the area of student assignment.

**C.    Evidence of Good Faith Compliance During the CSA Period**

The Board also argues that even if it did not meet the CSA's student enrollment goals at a sufficient number of schools, its failure can be forgiven given its good faith effort to implement the CSA's desegregation techniques.  See Morgan v. Nucci, 831 F.2d 313, 320 (1st Cir. 1987) (recognizing that a school board had discharged its desegregation obligations when it did not entirely achieve its student enrollment goals because of the school board's good faith efforts in implementing its desegregation plan).  In support of this claim, the Board argues that the CSA only required that it establish and fund a network of magnet programs at the Attachment C and D schools and, since it opened these programs and funded them, it met its obligations under the agreement.

The NAACP argues that the Board did not make a good faith effort to utilize the CSA's desegregation strategies because the agreement required the Board to implement one or more of the supplemental desegregation techniques outlined in the agreement that were designed to trigger parents to make a desegregative magnet school choice for their children.  Specifically, the NAACP argues that the Board knew that a bare magnet program would fail to desegregate the racially identifiable black schools because, unless the program included some provision that directed parents towards a desegregative school choice for their children,  parents would not

choose magnet programs in racially identifable black schools. Recognizing this difficulty, the CSA provided for a variety of means to encourage parents to make a desegregative school choice for their children, including re-drawing attendance zones, capping enrollment at Attachment D schools, and/or limiting curricular offerings at Attachment D schools, implementing a majority-to-minority transfer program and, as a last resort, re-instituting mandatory reassignment. CSA ¶¶ 19(a)-(c), 15 (a)-(b). The NAACP argues that because the Board refused to consider or fairly implement the supplementary magnet school techniques, it did not fulfill its obligations under the CSA.

The majority adopts the Board's view, as it reads the CSA to require only the establishment of a "free choice" student assignment program between a network of magnet schools. (Maj. Op. at 15-16). The majority also concludes that, although it was not required to do so, the Board made a good faith effort to institute some of the supplementary magnet program techniques, explaining that the Board adopted a majority-to-minority transfer program, redrew attendance boundaries, and capped enrollment at some of the Attachment D schools. (Id.) I do not believe the record supports either of the majority's assertions in this regard, and I address each issue in turn.

First, I cannot endorse the majority's restrictive reading of the CSA. We are

required to prefer a reading of a contract that "gives a reasonable, lawful, and effective meaning to all the terms . . . [over] an interpretation that leaves a part unreasonable, unlawful, or of no effect." See Restatement (Second) of Contracts § 203(a). The majority's reading of the contract runs afoul of this principle, as it makes surplusage of over three-quarters of the CSA, a 25-page contract containing 33 paragraphs that, when it includes the supplemental desegregation techniques, could be read as incorporating up to several hundred individual provisions targeted at achieving desegregation in the District's 144 schools. By treating the supplemental desegregation methods in the CSA as mere precatory references with no binding effect, the majority effectively nullifies most of the CSA's terms.[14]

A more reasonable interpretation of the CSA, one that gives effect to all of its terms, is that it was intended to function either as a "best-efforts" contract,[15] or an

---

[14]I am also concerned that the majority's reading of the CSA construes the agreement to provide for a program that is dangerously close to the voluntary choice program the Supreme Court rejected in Green v. New Kent County. See Green, 391 U.S. at 437-40 (explaining that "in desegregating a dual system a plan utilizing 'freedom of choice' is not an end in itself."). In Green, the Supreme Court explicitly held that a school board cannot satisfy its obligation to implement a desegregation plan merely by implementing an ineffective "voluntary" or "free choice" attendance program. Id. Therefore, if the contract could be interpreted in a manner that would not bring it in conflict with the Board's constitutional obligations, we are required to interpret in this manner. In this case, that reading would require that we construe the agreement to provide for additional obligations beyond the establishment of a free choice program. See Restatement (Second) Contracts § 207, & Appendix at 266 ("In choosing among the reasonable meanings of a promise or agreement or a term thereof, a meaning that serves the public interest is generally preferred.").

[15] Specifically, "a best efforts contract requires that the obligor must use best efforts to achieve a particular goal, but the risk of failure lies with the obligee. Black's Law Dictionary at 318. To be enforceable, a best-efforts term must generally set some kind of goal or guideline against which the efforts may be measured." Id. See also Murray On Contracts § 58 (explaining how the

53

"alternative contract." Black's Law Dictionary at 319 (1999). A best-efforts contract is "a contract in which a party undertakes to use best efforts to fulfill the promises made . . . [and] the adequacy of [that] party's performance is measured by the party's ability to fulfill the specified obligations." Id. An "alternative contract" is "a contract that provides more than one way for a party to complete performance, . . . [and usually] permits that party to choose the manner of performance." Id. Both of these types of agreements allow a party who is obligated to achieve a particular goal under a contract limited discretion to choose what strategy it will use to achieve that goal; however, the agreements also require that, if a party fails to meet a contract goal, and it does not utilize the strategies identified under the contract, it must present valid reasons for rejecting the contract's suggested strategies. See 17A Am.Jur.2d Contracts § 682 (discussing alternative contracts); 6 Corbin On Contracts § 1330 (same); Restatement Contracts § 469 (1921) (same). Under this reading of the agreement, the Board was not necessarily required to pursue all of the supplementary desegregation techniques in the CSA, but it was required to present evidence that it fairly considered adding the supplemental techniques in its effort to desegregate the Attachment C schools, and rejected them because they were impractical.

standard is interpreted in the commercial context).

54

In my view, the record unequivocally shows that the Board knew that its purely voluntary program was failing to reach the CSA's student enrollment goals in the Attachment C schools, but it failed to add any of the strategies recommended in the CSA as a more aggressive means to guide parents toward a desegregative school choice for their children. Specifically, the record shows that the Board knew as early as 1992 that the free-standing magnet program was failing to desegregate the racially identifiable black schools. (Tr. Vol. 10 at 162). The record also shows that, Dr. Larry Zenke, the Board's Desegregation Advisor, indicated that he was aware during the implementation of the plan that when other districts had used voluntary magnet programs to desegregate their schools, they had included methods to guide parents towards desegregative choices, including capping, balloting measures, and re-drawing school attendance zones. Zenke testified that although he conferred individually with the Board members about the District's problems in meeting the CSA's student enrollment goals, he never brought for a full Board vote any CSA desegregation strategy that would be perceived as constraining parents' choices in selecting schools for their children. Zenke explained that he made this decision because he did not support the adoption of these strategies and, based on his conversations with the Board, he did not believe that the majority of the Board would ever adopt any of them. (Id. at 161-162, 174). In Zenke's own words, the

55

Board's desegregation effort was "entirely based on voluntary options and choices" and it refused to consider any desegregation strategy that it interpreted as limiting parents' choices to send their children to a particular school. (Id. at 174).

Consistent with this approach, the Board persistently refused to implement any CSA mechanism that would guide parents' school choices. It continued with this purely voluntary effort despite substantial evidence that the voluntary program was not achieving the CSA's goals. Also, the record shows that the Board's efforts even undermined its purely "voluntary approach" to desegregating the schools. Specifically, the Board held a magnet schools fair, and it sent out a letter that guaranteed parents transportation if they agreed to transfer their children from a school where they were in the majority race group to a school where they were in the minority (a "majority- to- minority" school transfer). However, although the magnet fair and the transfer letters were supposed to encourage parents to make a desegregative school choice for their children, the Board assured parents that if they did not want their children to participate in the magnet program or the majority-to-minority transfer initiative, they could simply decline to participate in these programs, and by default end up in a neighborhood school. (Id. at 90). Therefore, it is not surprising that out of the 36,000 letters the Board sent to parents, only 332 families elected to have their children transferred. Parents knew that they were

permitted, with Board approval, to avoid a desegregative school assignment for their children simply by declining to respond to the Board's letters. The Board's actions were inconsistent with the commitment it made under the CSA. CSA ¶ 19.

Certainly, the CSA was not designed to hamstring the Board into pursuing unworkable solutions in order to achieve the CSA's goals. However, the record evidence shows that the Board knew that the bare magnet program was failing, and it knew why, but it did not consider in good faith any of the CSA's options for improving the program, and it did not attempt to identify any other means to achieve the CSA's student enrollment goals.

As an additional matter, our inquiry into good faith must take into account the Board's efforts apart from its unitary status obligations; that is, if the Board's other administrative decisions seem recklessly unmindful of the problems of segregation in the District, such behavior is inconsistent with a finding of good faith. In this case, the Board sought and received federal grant money to improve the Attachment C schools during the period covered by the CSA, and it spent this money in an effort to improve the core city schools. (Id. at 109). However, the Board's choices as to how to spend its other facilities dollars aggravated segregative trends in the District, thus creating well-funded but separate white and black schools. Specifically, the record shows that the Board did not build its new schools in the integrated area

57

immediately surrounding the core city, which, as the evidence reflects, contained the highest student population, the highest number of portable classrooms, the largest number of overcrowded schools, and declining school facilities.[16] Instead, the Board chose to build thirteen new schools over the past ten years in the almost all-white outlying periphery of the county.[17] In support of the proposition that its actions did not have a discriminatory purpose, the Board pointed to Milan Mueller's report, which showed that the District was experiencing the highest rates of population growth in the periphery of the county. However, almost all of these new schools

---

[16] The Board's demography expert, Dr. Milan Mueller conducted a study which documents this problem. Mueller divided Jacksonville into three concentric rings, Area A being the core city, and areas B and C, being the successive surrounding rings. Most of the Attachment C schools fall in Area A. Mueller testified at trial that thirteen new schools were built in Area C, a section of the Jacksonville in which the student population is 84% white, and one school was built in Area A, the core city, where the student population is 97% black. See Def. Exh. 77, tab.12 . No new schools were built or planned in Area B. This was the case even though Mueller's demographic research indicated that, throughout the course of the study, the highest concentration of students were enrolled in Area B (approximately 50% of the overall enrollment in the school district), an integrated area which was 55% black and 45% white. See Def. Exh. 77, tab.4. The Board argues that it made a valid administrative choice, as it was building schools in areas experiencing the most significant student population growth.( Tr. Vol. 3 at 115.) Although future planning is indeed a laudable goal, it is not laudable when it comes at the expense of remedying the Fourteenth Amendment violation.

[17] Instead of building new schools in the newly integrated outer core of the city, the Board used 500 portable classrooms in that area of the district. Simultaneously, it built new schools in the predominantly white residential neighborhoods in the outlying areas of the city away from the core. The Board knew that the Court was concerned about its distribution of new facilities, separate and apart from the Board's obligation to remedy the poorly funded and inadequate core city schools. Indeed, in NAACP we held, that the Board "failure to consider the objective of desegregation in its efforts to alleviate overcrowding violate[d the Board's] affirmative duty to desegregate." When combined with other factors, we concluded that this counseled against a unitary status finding. Id. at 952-53. Despite this warning, the Board made no effort to consider whether its strategy of using portable classrooms in the core, as opposed to building new schools, conflicted with its affirmative duty to desegregate the district's schools.

were under-enrolled at the beginning of their tenure. In contrast, during the same period, the Board built no new schools in the area immediately surrounding the core city to meet the needs of the naturally integrated and overpopulated schools.

In short, the record evidence in this case commands a finding that the Board failed to achieve the CSA's goals with regard to the core city's historically black schools under the magnet program, and that it did not give fair consideration to the CSA's supplementary methods for desegregating these schools. Simultaneously, the Board started a building program that created a new segregative trend within the District, and ignored the naturally intergrating trends that would have complemented its desegregation efforts.

**D.     Whether The District Was Desegregated To "The Extent Practicable.**"

The majority has also concluded that, in addition to showing that it complied with the CSA in good faith, the Board has satisfied its obligation under the unitary status inquiry to desegregate the district "to the extent practicable." Again, I would not reach this issue because I do not believe that the Board satisfied its obligation to show that it complied with the CSA in good faith. However, I address this point because I do not agree with the majority's view that the Board met its burden to

show that demographic changes made it impossible for it to achieve the CSA's student enrollment goals for the Attachment C schools.[18]

The Supreme Court has held that when a court reviews a school board's compliance with a desegregation order under the unitary status inquiry, it must presume that any remaining segregation in the school district is tied to the former de jure segregated school system, and therefore must be remedied before the court ends judicial supervision of the district. Keyes v. Sch. Dist. No. 1, Denver Colo., 413 U.S. 189, 208 (1973). A school board may rebut the presumption that the segregation in its district stems from the former de jure racially segregated school system by presenting evidence that it temporarily achieved the desegregation decree's goals, but that demographic changes in the district led to resegregation, *unrelated to the original de jure segregated school system*. Freeman, 503 U.S. at 494 ("Where resegregation is a product not of state action but of private choices, it does not have constitutional implications."); cf. Spangler , 427 U.S. at 435 (recognizing that a school board that had already achieved a desegregation order's

_____

[18] Together the Board's student enrollment statistics (Def. Exh. 96), and the demography report prepared by the Board's expert, Milan Mueller, establish that the core city schools had 90% black enrollments during de jure segregation, and the black pupil enrollments at these schools remained in excess of 90% for the duration of the CSA. The Board submitted raw data for the 1969-1970 time period. Mueller's report provides percentages for the later dates. The report shows that the core city schools were 96.1 % black between 1989 and 1990, 92.78% black between 1993 and 1994, and 93.45% between 1996 and 1997. The Board failed to identify any evidence to show that the 90% segregation in the core city schools was traceable to any intervening demographic shift that changed the racial composition of these areas.

60

goals could not be required by the court to continually change its efforts to address the *changing demographic composition of the district*).[19]  Courts have also recognized that a school board may use demographic evidence to show that it cannot accomplish a desegregation decree goal because the demography of the district has dramatically changed, and the desegregation plan is no longer workable. Dowell, 498 U.S.at 242 (discussing a district court order in which the court ruled that demographic changes made the district's desegregation plan "unworkable"). These arguments, however, are not available to assist those school districts that, because of willfulness or neglect, still contain a large pool of segregated schools after decades of federal court supervision, and these schools are the exact same schools that the court initially identified as the vestiges of the district's de jure segregated school system, and the high racial concentrations at these schools are not traceable to any independent post-decree demographic changes.

The Board cites demographic evidence to show that the CSA's desegregation goals are impracticable because the District has experienced "white flight."  See Morgan, 831 F.2d at 322-23 (recognizing white flight as a factor beyond a school board's control);  Ross v.  Houston Indep. Sch., 699 F.2d 218, 225 (5th Cir. 1983)

---

[19]The majority appears to suggest that once a Board presents evidence of demographic shift within the district, this establishes that there is "no constitutional violation."  However, the proof of demographic shift shows that some segregated schools should not be included in the court's assessment as to whether the original constitutional violation has been remedied.

(same).  Specifically, the  Board claims that white students have withdrawn from the Duval County public school system to attend private schools, leaving it with an insufficient white student pool to achieve the CSA's goals. The Board also argues that whites have moved away from the neighborhoods associated with the core city schools, making it even more difficult to desegregate these schools.  The Board offered three pieces of evidence to support its contention of "white flight": (1) district-wide enrollment statistics showing a 12% decrease in the number of white students over the twenty seven years prior to the CSA's creation; (2) eyewitness testimony from its former superintendent and current Desegregation Advisor, Dr. Larry Zenke; and (3) a report on black residential migration patterns, prepared by Dr. Milan Mueller.  I cannot agree with the majority that this evidence showed that a new *post-decree* trend of "white flight" transformed the core city into an area with a school-age population that is 96% black and, thus, made it impracticable to further desegregate the core city schools.  (Maj.  Op.  at 19).  Rather, the record shows that the District's white flight predated the CSA, and was adequately accounted for in the CSA's student enrollment goals.

The Board's argument mainly relies on the District's student enrollment statistics showing that between 1969 and 1990,  the proportional number of white students in the Duval County's public schools decreased by 12%.  They ask that we

rule that this decrease, suffered over a twenty seven year period, was significant enough to render the enrollment goals under the CSA for the Attachment C schools impracticable. However, the record indisputably establishes that the majority of the white flight had occurred *before* the CSA was created. (Dist. Ct. Op. at 10). During the enforcement term of the CSA the Board experienced only a 4% decrease district-wide in the number of white students.[20] Because the Board was already aware of the majority of this white flight when it negotiated the agreement, it seems likely that the parties accounted for this change, and agreed to relax the black student enrollment figures to 20-55% at the core city elementary schools, rather than the more stringent 21-34% figure required under the Mims Injunction. Indeed, it seems fundamentally unfair to allow the Board now to argue that the more relaxed enrollment standards under the CSA are unreachable based on this earlier, larger pattern of white flight, particularly when this problem is adequately accounted for in the CSA's goals.

Rather, in my view, our inquiry must be confined to the 4% white flight that actually occurred during the term of the agreement and, thus, was not accounted for in the CSA's goals. I am unconvinced that this 4% district-wide shift could have

---

[20] This fact is corroborated by Mueller's report, showing that the black population district-wide increased from 36.5% to 40.2% over the course of the CSA, and the white population decreased from 59.5% to 54%. (Mueller Report at 4).

had any real effect on the Board's ability to desegregate the core city black schools. (Maj. Op. at 19).[21] Since the time of the <u>Mims</u> Injunction, the parties have been on notice that it is impossible to desegregate the formerly de jure black core city schools without mass busing. <u>Mims</u>, 329 F. Supp. at 130. The CSA was simply designed to end *forced* busing, and instead to encourage parents to volunteer to have their children bused to core city schools, either by subtly limiting parents' choices, and/or by creating a group of highly attractive core city schools. The CSA represents the parties' attempt in 1991 to establish a fair and equitable standard to determine whether desegregation had been achieved in light of the current demographic status of the District after the implementation of the CSA desegregation program. By allowing the Board to rely on the pre-CSA pattern of white flight as evidence that it cannot achieve the CSA's goals, the majority allows the Board to escape its contractual obligations.

**CONCLUSION**

The majority notes that the Duval County School Board has been embroiled in litigation for forty one years, has been subject to orders from five district courts,

---

[21] Also, a 4% shift in the District's white student enrollment is hardly the kind of dramatic demographic change about which the Supreme Court was concerned For example, in <u>Freeman v. Pitts</u>, the black student ratio increased from 5.6% in 1969 to 47% in 1986. <u>See</u> 503 U.S. at 476. Also, in <u>Missouri v. Jenkins</u>, 515 U.S. at 95 n.6. , the demographic shift that triggered the district's doomed attempt to create an interdistrict remedy was from 18.9% in 1954 to 60% in 1975. Here the record shows no such dramatic change in the racial make-up of the student population in Duval County.

and has appeared multiple times before this court seeking review of its decisions. In its view, the time for judicial supervision is at an end. However, it likewise bears noting that the duration of court supervision occurs only as a result of a school board's failure to satisfy its desegregation obligations. I agree that Duval County School Board has made substantial progress in many aspects of its desegregation mandate; however, the record does not support the view that it met its obligations in the area of student assignment. Accordingly, I believe that under the CSA we are required to retain judicial supervision over the District in the area of student assignment.